### Charles A. Lorman v. Henry E. Benson.

The common law is in force in Michigan, and questions of property, not clearly excepted from it, must be determined by the common law, modified only by such circumstances as render it inapplicable to our local affairs.

Although, in England, in the common law sense of the term, those streams only are navigable in which the tide ebbs and flows, yet all rivers and streams above the ebb and flow of the tide, which are of sufficient capacity for useful navigation, are public rivers, and subject to the same general rights which the public exercise in highways by land, and which they possess in navigable waters.

The common law principle, that the soil under such tideless public rivers to the thread of the stream is in the owner of the adjacent bank, prevails in this state, and is applicable to the Detroit River.

The owner of the bank is entitled to every beneficial use of the soil under the river which can be exercised with a due regard to the public easement, and any trespass which interferes with such use, like an obstruction preventing the taking of ice, gives him a right of action for the damages thereby occasioned.

The right to raft logs down a stream does not involve the right of booming them upon private property for safe keeping and storage.

*Heard November 29th and 30th,* 1859. *Decided January 9th.*

Case reserved from the Circuit Court for the county of Wayne, as follows:

"This was an action of trespass *vi et armis*, brought by Lorman against Benson. Plea, the general issue, with notice of license.

"The cause was tried by the court without a jury.

LORMAN v. BENSON.

"From the evidence adduced on the trial the court find the following facts:

"At and before the time of the alleged trespass, one Anthony Dudgeon was the owner in fee of certain premises above the city of Detroit, and fronting upon the Detroit river, which was the *locus in quo* of the said trespass. On or about the 15th of November, 1857, he leased the same by a lease in writing to the plaintiff, therein describing the same as bounded in front by the Detroit river, for the term of five years; and the plaintiff thereupon entered immediately into possession, and erected an ice house upon the premises, which ice house was fronting upon and near to the waters of the Detroit river. Prior to the execution of this lease Dudgeon had given the defendant, Benson, a parol license to erect a boom near to the shore on the river front of the premises, and between said shore and the channel bank of said river (said channel bank being a term applied to a place in said river nearer to the main bank than the center of the river, and about 700 feet from the shore, where the water becomes some feet deeper than it is nearer to the shore), and to maintain and use the same for the purpose of keeping and securing saw logs therein, until he (Dudgeon) should desire to use the river front for other purposes, or should lease the premises.

When the plaintiff took possession of the premises, under his lease from Dudgeon, the entire river front was occupied and obstructed by a boom, and a large quantity of logs therein, which had been placed there by the defendant in pursuance of this license from Dudgeon. The plaintiff immediately gave the defendant notice to remove the same, claiming that the defendant's right to maintain the same there, under the license from Dudgeon, was terminated; that he, the plaintiff, as the lessee of the premises, was entitled to have the river front free from any such obstruction, in order that he might conveniently gather ice there to fill his ice house during the then coming winter.

LORMAN *v.* BENSON.

"The defendant refused to remove the said boom and logs as required, but continued to maintain the same in the place mentioned throughout the winter, and this is the trespass complained of by the plaintiff.

In consequence of the river front being so obstructed by the said boom and logs, the plaintiff was unable to gather ice there during the winter of 1857 and 1858, but was compelled to gather his ice with which to fill his ice house at a much greater distance from said ice house, to float the same by circuitous and inconvenient routes to said ice house, at considerably greater expense than would have 'been necessary if the river front of the premises had been open and unobstructed by defendant's said raft of logs and boom, and he sustained damages in consequence of said obstruction to the amount of

"Upon these facts the following questions arise:

"1st. Had the plaintiff, as lessee from the owner in fee of the said premises fronting on Detroit river, any such right to the use and enjoyment of the river front between the shore and the channel bank of said river, as entitled him to maintain the present action against the defendant for obstructing the same, with his boom and saw logs, in the manner above mentioned?

"2d. Has the defendant a legal right to float and boom logs in any part of the Detroit river, in a reasonable manner, so as not to interfere with navigation in summer and travel in winter?

"3d. Is trespass or *case* the appropriate form of remedy?

"4th. Have riparian proprietors on the Detroit river a right of property in the soil under the water, or in the ice, or the exclusive right of taking the same in front of the premises to the middle of the stream?

"5th. Are the damages claimed by the plaintiff sufficiently certain and direct to be allowed?

"Which questions, being deemed of sufficient importance, are hereby reserved for the opinion of the Supreme Court thereon."

LORMAN v. BENSON.

*Geo. E. Hand,* for plaintiff, cited:

*Hale De Jure Maris,* Ch. 1; 3 *Kent,* 427; *Wool. on Wat.* 1, 40 to 46; *Shult's Aq. Rights,* 58, 88, 106, 138; *Ang. on Watercourses,* 605; *Ang. on Tide Waters,* 75; 6 *Cow.* 518; 2 *Conn.* 483; 4 *Burr.* 2164; 12 *Mod.* 510; 1 *Mod.* 105; 3 *How.* 227; 20 *Johns.* 99; 26 *Wend.* 404; 5 *Pick.* 201; 2 *Cush.* 190; 3 *N. H.* 321; 2 *N. H.* 369; 31 *Me.* 9; 3 *Greenl.* 248; 3 *Rand.* 33. 38; 3 *Ohio* 495; 11 *Ohio* 311; 16 *Ohio* 540; 3 *Blackf.* 198; 3 *Scam.* 510; 5 *Gilm.* 548; 2 *Wis.* 308; 4 *Wis.* 486; 3 *S. & M.* 366; 4 *Mason* 397; 1 *Halst.* 1, 67; 5 *H. &. J.* 195; 1 *Rand.* 417; 14 *Mass.* 149; *Taylor,* 176; 5 *Wheat.* 374; 13 *Wend.* 356; 18 *Barb.* 277; 4 *Mich.* 322; 9 *E. L. & Eq.* 513.

*T. Romeyn,* on same side:

If the Detroit be viewed as a *river,* in the sense of the common law, then the argument already made exhausts the subject.

But if as a *strait,* and the rights of the owners of land on its borders are like those of the owners of lands on the shores of the lakes which it connects, — see *Kingman v. Sparrow,* 12 *Barb.* 201, — it then becomes necessary to ascertain what are the rights of riparian owners upon these Northwestern lakes, and the straits connecting them.

1. The United States, as a sovereignty, have no right of soil, or jurisdiction, in premises situated like the *locus in quo.* — *Pollard's Lessee v. Hagan,* 3 *Howard* 312.

The title to the land under water, on the sale of the contiguous upland, either remains in the United States, or is vested in the States in which it lies, as an incident to the sovereignty, or it passes to the grantee of the upland as an incident to it.

If all the waters covering the land be viewed as not *navigable,* according to the recognized legal meaning of that term, then, beyond question, the lands under them pass from the United States to the grantee of the uplands bordering on them, as an incident to such grants.

LORMAN v. BENSON.

If viewed as navigable waters, then the lands under them either passed to the grantees of the uplands bordering on them, or have become the property of the respective states within which they lie, as incidents to their sovereignty.

2. The title to, and property in, such lands, are not in the *state*.

There is a clear and settled meaning, at common law, attaching to the term "*navigable*," in connection with the extent of the *rights of riparian proprietors*. In this connection, it is strictly limited to the sea, and to waters within the *ebb* and *flow of the tide*. On these, the rights of the riparian proprietor (in the absence of a grant from the Crown) extend only to high water mark.

In the Atlantic states the rule is similar, though locally modified by statute or usage. But, on other than tide waters, according to the English common law, and the law of most of the states, the title of the riparian proprietor extends beyond the water line, and includes the adjoining lands under water.

The adjudications, in all the states formed out of the Northwestern Territory and bordering on the lakes, concur in deciding that a grant by the United States of lands bordering on the meandered stream or body of water, carries with it a title to the adjacent lands under water.

In Michigan, the question has never been before the Supreme Court directly, but I view the rule in practice as well understood and settled.—*Norris v. Hill*, 1 *Mich.* 202; *Moore v. Sanborn*, 2 *Mich.* 519.

For decisions in other states, see *Grant v. Mathews*, 3 *Ohio* 495; *Lessee of Blanchard v. Porter*, 11 *Ohio* 138; 5 *Ohio* 320; *Ibid.* 410; *Walker v. Board of Pub. Inst.*, 16 *Ohio* 545; *Doe v. Hildreth*, 2 *Ind.* 282; *Jones v. Peckham*, 2 *Wis.* 315; *Middleton v. Pritchard*, 3 *Scam.* 510; *Canal Trustees v. Haven*, 5 *Gilm.*, 548; *Walker v. Shephardson*, 4 *Wis.* 486.

The Supreme Court of the United States recognize the same rule. — *Brown v. Hager*, 21 *How.* 320.

There is no difference whatever *in principle* between rivers like the Mississippi, the Ohio, the Milwaukee near its mouth, the Illinois, and the lakes or their connecting straits. And the adjudications in the Northwestern states, and in the Courts of the United States, do not refer to, nor imply any.

In the case of *Genesee Chief v. Fitzhugh*, 12 *Howard* 450, the decision avers that the lakes and rivers are *both navigable*, within the meaning of the grant of *admiralty jurisdiction* to the general government, and *both* are placed upon the same footing. It does not touch the question of riparian ownership or rights. But in the reasoning and the conclusion, it is evident that court viewed a great lake and a great river as *alike* in legal character.

There being in fact no distinction at common law between the *sea* and *tide water rivers*, as to admiralty jurisdiction or riparian rights, and there being no distinction as to admiralty jurisdiction or public character between the lakes, and the straits connecting them, and the great navigable rivers of the west, it is illogical and unwarrantable for the court to make such distinction between the rights of riparian owners on the great rivers and those on the lakes.

This question has received a *practical construction* in the Northwestern states, in favor of the rights of the riparian proprietor to lands under shallow water, adjacent to the main land, and not required nor suitable for navition; and should be considered as settled.

Independent of the general rules as to the effect of usage and custom, it is certain that in England rights in this kind of property differ in different localities, through the effects of local usages.

And in the several states, the varying rules on this subject are traced to and rest upon usage and common

understanding. In regard to these, *usage makes the law.*—
See *Hale De Jure Maris, pp.* 5, 6, 15, 19, 25, 26, 27, 28,
35; *Ang. on Tide Waters,* 226; *Ang. on Highways,* 51, 52;
*Shunk v. Schuylkill Nav. Co.* 14 *S. & R.* 71; *Bennett
v. Boggs, Baldwin* 76; *Bell v. Gough,* 3 *Zab.* 624. There
is in fact no such thing as a general common law on
this subject. Usage makes the local law.

Whether speculatively right or not, this usage and cus-
tom are evidence of what are the public reception and
application of the law. By adoption and use they thus
make the law. In cases like this the maxim prevails,
"*Communis error facit jus.*" — See 3 *Barb. Ch.* 577; 4 *Inst.*
75; 2 *Eden,* 74; *Hopk. Ch.* 267; 5 *Cranch* 32; 1 *S. &
R.* 106; *Coke Lit.* 186.

The existence and extent of this general public usage,
and of legislative action, will be judicially noticed by the
courts. — 1 *Greenl. Ev.* § 6; *Gibson v. Stevens,* 8 *How.* 399.

*A. Russell,* for defendant, cited:

To the point that the court could not take judicial
notice of local law or usage, — 1 *Greenl. Ev.,* § 4, 5, 6;
1 *Steph. Com.* 55. That local custom could not supersede
the common law, — *Winder v. Blake,* 4 *Jones* 332. That the
law knows no intermediate line between high water mark
and the thread of the river, and the riparian proprietor
must be bounded by one or the other; *McManus v. Car-
michael,* 3 *Iowa* 1.

That the obstruction by the raft was an inconvenience
consequent upon the rightful use of the river, and, if oc-
casioned by misfortune or unavoidable accident, there is
no legal remedy, — 4 *Harr.* (*Del.*) 315; 4 *Mo.* 343, 345;
3 *S. & M.* 366, 408; 3 *Scam.* 521; 13 *Wend.* 371; 1
*Jones* 299; 31 *Me.* 9, 24; 3 *Yerg.* 307; 2 *Swan* 9; 18
*La.* 295, 305; 1 *Campb.* 517, *note;* *Angell Tide Waters,
pp.* 80, 93; 2 *Mich.* 519; 7 *Martin, N. S.* 433.

And to the main question, — *Ang. on Watercourses,*

*pp.* 603. 613; *Walk. Ch. R.* 155; 1 *Newb. Adm.* 543; 1 *Dutch.* 525; 2 *Swan* 9; 4 *Seld.* 472; 18 *Barb.* 277; *Ibid.* 14; 19 *Barb.* 484; 12 *Barb.* 616; *Jacob's Law Dic.* "*Straits.*"

As to the right of property in the ice, provided the riparian proprietor be held to own the bed, — *Gale and Wheat. Easements*, 26, 27; *Ward v. The People*, 6 *Hill*, 146.

CAMPBELL J.:

The rights of the plaintiff in this case depend entirely upon the doctrines applicable to riparian proprietors upon the water communication which is known as Detroit river.

Some reference was made on the argument to the general system of law prevailing here, in view of the former history of the country; but we deem it useless to enter into any extended examination of this question. It is undoubtedly true that at one time the Custom of Paris was in force here. It was expressly abrogated by the Territorial Legislature in 1810, and probably applied to very few cases then, if to any. Practically the common law has prevailed here, in ordinary matters, since our government took possession; and the country has grown up under it. How, or by what particular means, it originated, would open an inquiry more curious than useful. A custom which is as old as the American settlements, and has been universally recognized by every department of government, has made it the law of the land, if not made so otherwise. Our statutes, without this substratum, would not only fail to provide for the great mass of affairs, but would lack the means of safe construction. We are of opinion that questions of property, not clearly excepted from it, must be determined by the common law, modified only by such circumstances as render it inapplicable to our local affairs. Such was the view taken in *Stout v. Keyes*, 2 *Doug. Mich.* 184, and in the opinion of Mr. *Du Ponceau*, cited in 1 *Bish. Cr. Law*, §15, *n.* 4.

There are no tide waters within this state, and there-

fore no waters which, by the technical meaning of the term
"navigable" at common law, would come within it. But we
have more than a thousand miles of external boundary wat-
ers, which are open to navigation in the popular sense, and
many interior streams valuable for purposes of public con-
venience and passage. The inquiry before us is, whether
our circumstances require the common law rule to be so
modified as to apply the doctrines belonging to tide waters,
navigable in the common law sense, to these waters, which
are beyond the tidal influence.

By the Ordinance of 1787, these waters, which are there
designated as "navigable," are declared to be public high-
ways. No special force can be derived from this language
however, for it applied very evidently not only to ship and
vessel navigation, but more generally to the passage of
canoes and bateaux, which were then the chief means of
conveyance, there being few large vessels and fewer land
roads. But the Ordinance couples with the waters the port-
ages or carrying places connecting them, and which were
used by the parties making long voyages in small boats, in
passing from river to river. Such were the portage between
Fox and Wisconsin rivers, that around the falls of St. Mary,
and others. We are therefore compelled to look at the
nature and situation of the streams themselves, and not to
any mere verbal nicety. And it becomes necessary to
glance at the rules of the common law as applied in Eng-
land, and to see how and wherein our position may require
a modification of them.

There are, in England, two kinds of water highways.
All rivers and streams above the ebb and flow of the tide,
which are of sufficient capacity for useful navigation, are
public rivers, and subject to the same general rights which
the public exercise in highways by land, to which Lord
Hale aptly likens them. In these streams the adjacent pro-
prietor owns the banks and bed, and has a right to make
such use of this land, and of all benefits of the stream,

as will not interfere with the public easement or servitude. Formerly it was doubted whether a right to the use of the bank for towage was not appurtenant to the public easement of navigation, but it is now declared to exist only in particular places by local usage. — *Ball v. Herbert*, 3 *T. R.* 263; *Blundell v. Catterall*, 5 *Barn. & Ald.* 268. Wharves, or other appropriations of the bed of the stream were only allowed so far as they did not actually obstruct free navigation, and when they did so, they were indictable as public nuisances. Their analogy to highways was complete. — *Hale de Jure Maris, ch.* 2, 3.

All navigable waters in which the tide ebbed and flowed were also public highways. The right of navigation was precisely like that in other public rivers, and there was no right to use the banks for towage. But there were some important distinctions to which we must carefully attend. The grant of land bounded by the stream did not convey the fee to the centre or thread of the stream, but stopped at the line of ordinary high tides, which is declared in the late case of *Attorney General v. Chambers*, 27 *Eng. L. & Eq.*, 242, not to extend up to the line of highest tides, but to that medium line which is the average bound of ordinary and natural high tides throughout the year. The shore (which signifies the land between high and low tide), and the bed of the stream, were the property of the King or of individvals, but presumed to be in the King until shown to belong elsewhere. When owned by the King, it was as part of his *jus privatum*, and subject to be disposed of by him until restrained. — See *Attorney General v. Burridge*, 10 *Price* 350; *Attorney General v. Parmeter*, *Ibid.* 378; *Parmeter v. Attorney General*, *Ibid.* 412. And it was subject to substantially the same rules and burdens whether owned by the King or by private persons. — *Mayor of Colchester v. Brooke*, 7 *Q. B.* 339, *and cases above cited.* The public had a right of navigation over the whole bed of

the stream at high tide, and over the water, so far as it was practicable, at all tides. As this was a common law right, and only to be repealed by Parliament, the King could not, neither could any one by his authority, make any erections which would obstruct navigation. Thus far his rights were qualified by the public easement, precisely like those of a private owner in the bed of a public stream above tide water. In both classes of streams the public easement controlled the use of the land. The easement reached the high water line whenever the tide was up, and prevented any permanent improvements below that line as effectually as below the ordinary river margin, and no more so, and for no different reason. The owners of the soil in both streams could make any erections which were not nuisances, and their character as nuisances was to be determined as a question of fact:— *King v. Tindal*, 1 *Ad. & E.* 143; *Regina v. Betts*, 22 *Eng. L. & Eq.* 240; *Hale de Port. Mar.*, pt. 2 ch. 7 p. 85. The Legislature could grant to the owners in either case the right to make such erections as would otherwise be unlawful, for they may determine or extinguish any public right; and this power has frequently been exercised; and, when occupied for public use, by railroads or other works, the owner, whether King or subject, is entitled to his damages for the use of it.— See *Rex v. Montague*, 4 *B. & C.* 598; *Abraham v. Great Northern Railway Co.*, 5 *Eng. L. & Eq.* 258.

The principle which gives the land between high and low water mark to the crown, is said, in the case of the *Attorney General v. Chambers* (above cited) to be "that *it is land not capable of ordinary cultivation or occupation;* or, according to the description of Lord Hale, as generally dry and manurable; and so it is in the nature of unappropriated soil. Lord Hale gives as his reason for thinking that lands only covered by the high spring tides do not belong to the crown, that such lands are for the

most part dry and manurable; and, taking this passage as
the only authority at all capable of guiding us, the rea-
sonable conclusion is that the crown's right is limited to
lands which are, for the most part, not dry or manura-
ble." — See also *Lowe v. Govett,* 3 *B. & Ad.* 863.

Here then we have the doctrine very clearly maintained,
that the riparian owner takes all the land which is of
any use for ordinary purposes, and all which is not com-
monly submerged by the average ordinary high tides, which
would seldom leave any of the shore dry more than twenty-
four hours at a time. It is not reserved, therefore, as
useful land, but as waste land which is characterized by
the water service over it. And the firm land, which is
made by alluvium, becomes private and not crown pro-
perty. — *Gifford v. Lord Yarborough,* 5 *Bing.* 163; *Scrat-
ton v. Brown,* 4 *B. & C.* 485. But as the public are
sometimes said to have rights to some easements on the
shore, it may be well to notice what those rights are.

The case of *Blundell v. Catterall,* 5 *Barn. & Ald.* 268,
contains a more full investigation of this subject than any
other modern case to which our attention has been called.
As we have already seen, the public rights are in gene-
ral the same whether the soil of the bed and shore of
tide waters is owned by the crown or by individuals. In
the case now referred to, the plaintiff, a private person,
owned the shore and upland, and brought an action of
trespass against the defendant for crossing the shore on
foot, and with carriages and bathing machines. The defend-
ant justified on a claim of a public right of way for bath-
ing purposes. The case was considered by the court upon
the general law of the land, and may be regarded there-
fore as a fair exposition of it. It was held by all the
court except Best J. (Abbott C. J., Holroyd and Bayley
JJ. concurring) that no general right existed under which
the defendant could justify. And it was laid down as a
general rule, that the public rights over the shore existed

not as land but as water - rights, to be exercised when the land was covered by the tides. The only public rights recognized as commonly existing on such waters were those of navigation and fishing; and it was left undecided whether any common right of fishing could ever exist where the soil was private. And it was very clearly held that no one could, of right, plant stakes or other temporary or permanent conveniences for drawing nets on any part of the sea - shore, whether private or not, except the land owners. The right of landing, and of loading and unloading, was held to exist (except by particular custom) only in ports and established landings. And, while it was said that it was quite common to use the shore for various purposes of passage, that use was regarded not as rightful, but merely by sufferance, and analogous to the frequent passage over unenclosed lands, which was not lawful, but was seldom complained of.

When, therefore, we look at the state of the common law upon the subject before us, it is very evident that the ebbing and flowing of the tide, and not the mere susceptibility of the stream to purposes of useful navigation, has made the distinction between the rights of riparian owners on the fresh and tidal public streams of England and that, where these happen also to own the shore on tide waters, their ownership is not distinguishable for any useful purpose, if at all, from their dominion over the beds of fresh water public rivers. By giving in all cases the whole extent of dry and available land to the bordering owner, the law left to the crown, in any case, a very unprofitable ownership, which could rarely aid him, or any grantee, unless the latter owned also the upland.

In both kinds of public streams the rights of navigation were the same; and, so far, the public at large had no interest whatever in the question of ownership of the bed of the water. The right of fishing in navigable rivers was not originally a general common law right of every

subject, excluding the possibility of a private right to a several fishery, but a prerogative right of the crown, and grantable with, if not attached to, the soil in private hands. Considering the high esteem in which navigation was held in England, we may be sure that no principle would have been allowed to grow up into common law, which would materially impair the shipping interest. And the adjudged cases recognize the common sense doctrine that it did not matter who held the fee of property, so long as the public easement was maintained. We do not find that the public rights over navigable waters belonging, with their beds, to manors, were any more hampered than when the title was in the crown. The doctrine that the whole public easement ceased with the destruction of the navigable character of the waters, is intimated in *Rex v. Montague*, 4 *B. & C.* 498, and strongly confirms *Blundell v. Catterall* in the limitation of public rights not depending on navigation.

The Roman law recognized the title of the river beds as belonging to the riparian proprietors, subject to the public easements of passage and towage, and of moorage on the banks. The modern civil law is said to be generally different in this respect; but it is laid down by Justinian that all newly-formed islands belong to the riparian proprietors; and Vinnius demonstrates that this right is incident to and derived from the ownership of the bed.— *Vinnius Com. on Justin. Lib.* 2 *Tit.* 1, §§ 4, 5, 20, 22, 23. And see also the opinion of the Chancellor in *Canal Appraisers v. The People*, 17 *Wend.* 592, 3.

It is also worthy of remark, that in this country, in most of the states where it has become necessary to discuss tide-water rights, all of the modifications made have been in favor of riparian owners, extending their privileges beyond those at common law. We do not deem it necessary to review the many cases cited on this subject by counsel. They differ in many particulars, but in most of them we perceive an enlargement of riparian privileges, and in no case is there any curtailment of them.

In applying the principles of the common law to the tideless stream in question, we do not perceive what public interests would be subserved by placing it on the footing of tide waters, when the rules applying to public fresh water streams provide amply for every common easement. The right of navigation, to which all others are subservient, is in no way injured or abridged by this holding. And the necessities of wharves, and other conveniences, which could not be made available at all in such a stream as this unless owned by the riparian proprietor (because not accessible except over his grounds), would be an inducement to modify the common law, were it otherwise, rather than change it as it is now. We can perceive no advantage to the state in setting up a barren and useless title. We think that in this respect the common law is already adapted to our circumstances, and needs no changing.

It is urged that this ruling will interfere with the improvement of rivers, and disturb the title of islands. But these objections are not well taken. The public authorities can regulate water highways as well as land highways, although the soil of neither belongs to the state. And if the government see fit (as is the case with all islands in this river, which have not only been kept separate as property from the mainland, but most have been named and distributed between Great Britain and the United States by treaty) to regard each island as a separate property, this infringes no common law rule. Islands have always been susceptible of separate ownership, and when so separated the *filum aquae* is to be drawn between them and the mainland. The facts before us create none of the embarrassments which have been suggested to us, and we have no difficulty in holding that the plaintiff is entitled to every beneficial use of the property in question which can be exercised with a due regard to the common easement. The cutting of ice is the exercise of a valuable privilege in securing that which has become stationary on the freehold;

and we can conceive of no reason which would justify a denial of it. And we think a trespass creating an obstruction which prevents it, justifies a finding of damages for this as a direct consequence of the injury. — *White v. Mosely*, 8 *Pick.* 356. The right to raft logs down the stream does not involve the right of booming them upon private property for safe keeping and storage, any more than the right to travel a highway justifies the leaving of wagons standing indefinitely in front of private dwellings or stores. And the booms in question were erected under a license from the plaintiff's grantor now determined, and not under any right or claim of right as appurtenant to navigation.

The cases cited from Ohio, Indiana, Illinois, and Wisconsin, as well as from some of the older states, show, as we think, that the common law rule is the most desirable one, so far as fresh streams are concerned.

Had the usage of this region been inconsistent with the rule we have adopted, that might afford some reason for doubting its applicability. But usage has uniformly conformed to it, and, so far as we have any legislation bearing upon the subject, it recognizes the rights of private owners fully. The charter of Detroit, passed in 1827, contained the following provisions: "That nothing in this act contained shall be construed to vest in the said corporation, or any officers thereof, any right to the water, or the land under the water, in front of the farms included within the said city, nor any power to erect, or cause or authorize to be erected, any wharf or other thing on the said land; *but the right of the proprietors of the said farms, to the water and land in front of said farms, and to fill in the water, and erect fixtures thereon, shall remain and vest in said proprietors the same as if this law had not passed. R. L. of 1827, p.* 588, §49. This provision was preserved in terms until the passage of the new charter of 1857, which indirectly recognizes the same principle, by giving to the city power to regulate navigation, and to build wharves on their

own property; but, as to all other property, merely to estab-lish a line beyond which wharves shall not extend. — *L.* 1857, *p.* 95. The right of individuals has been constantly asserted and exercised.

We think that the plaintiff has, under his lease, a legal interest in the land covered with water, which will support the action of trespass; and that the hindrance in taking ice was the proper subject of damages under the case presented.

The other Justices concurred.