RYAN v. BROWN ET AL.

## Thomas Ryan v. George W. Brown et al.

*Voluntary deed: Consideration.* A voluntary deed, without consideration, can only be avoided by some one having equities against it.—*15 Mich. 94.*

*Riparian Rights:* The ownership of lands, bordering upon a stream, extends over the bed to the middle of such stream, when it is a river. Any erection which can lawfully be made in the water, within those lines, belongs to the riparian estate, and the complete control and the use of such land covered with water is in the riparian owner, except as it is limited and qualified by such rights as belong to the public at large, to the navigation, and such other use if any, as appertains to the public over the water.—*8 Mich. 18; 10 Id. 125.*

*United States grant to Michigan for Sault St. Marie's Canal, extent of.* The grant to the State of Michigan of land—to locate a canal upon at the Sault Ste Marie, extends only to the military reserve, and does not include private property below it.

*Enforcement of State Proprietary Rights.* Where the State sets up proprietary rights over property, they can only be maintained upon proof of a valid grant, or legal appropriation upon an inquest in form of law.

*Sault Ste Marie Canal Board: Obstructions.* The Sault St. Marie Canal Board have such a control over the canal and its approaches as to be authorized to remove such obstructions to the legitimate use of the canal as are unlawful. But they have no such judicial authority as to make their finding of any conclusiveness upon the fact of illegality, and, if they interfere with private rights, they act at their peril, and are responsible for their conduct.

*Riparian Rights: Public Streams: Encroachments.* In waters, whose beds are public property, erections by riparian owners, are unlawful, not because they are nuisances, but because they are encroachments on the public domain. But, when the ownership is private, and the public rights are simply easements, or privileges, the owner may use it as he chooses, subject always to the condition that he does not interfere with the full public enjoyment.

*Riparian Rights: Jury: Navigation.* In the case of natural water courses, the extent to which private improvements are compatible with the public use, must depend upon circumstances, and must always be a question of fact. The owner's use is *prima facie* lawful.

The right of the public for purposes of navigation must be considered as appurtenant to the ordinary means of navigation, rather than to small and insignificant boats, and it is no nuisance to erect reasonable wharves and similar improvements, as these are essential to modern commerce.

*State Canal: Sault St. Marie's River: Obstructions.* When certain erections built upon private property for dock purposes, and not encroachments on the natural navigation of the river, were sought to be removed by the "Sault St. Marie Canal Company," as obstructing its canal navigation:

RYAN *v.* BROWN ET AL.

*Held*, That erections in the St. Mary's River, at the head of navigation, and serviceable to navigation, did not become unlawful by the subsequent opening of the canal, and cannot be appropriated or destroyed for canal purposes until paid for by the State. Said canal is in no sense a part of the Ste. Marie's River, but an independent water way to connect the river above the falls with the stream below, and similar to a turnpike.

The State has no more right to interfere with private property, without compensation, to make or improve a canal, 'than it has for a road upon land.

*Constitutional law : Streams within State: Internal police.*   Under *Art. 18,* § 4 of the Const. of 1850, which declares that no navigable stream shall be either abridged or dammed, without authority from the Board of Supervisors of the proper county under provisions of law:

*Held*, That the provisions refer only to such streams as are wholly within the State, and which at any given point must be under the control of one or more boards of county officers. The provision relates to the internal police, and does not apply to streams which are State boundaries.

*Held, also,* That the word "abridged" should read "bridged," as the clause was so adopted by the Convention.

*Equity Jurisdiction: Trespass: Official oppression.*   When a trespass is calculated to do permanent damage to the freehold, the jurisdiction of chancery will be exercised. And where it is an act of official oppression by public officers and agents, under color of office, a less grievance constitutes a ground for an interference of equity, than when the trespass is by a private person.

*Heard April 16.   Decided April 20.*

Appeal in Chancery, from Chippewa Circuit.

The bill in this case was filed in the Circuit Court for the county of Chippewa, in Chancery, to restrain · the defendants from committing a trespass on the property of complainant by removing a dock, warehouse and certain sunken cribs, intended as the support of a dock in St. Mary's river, at the village of Sault Ste Marie.   An injunction issued, which, upon final hearing, was dissolved as to one portion of the property, and made perpetual as to the residue.

The defendants appealed to this Court.

*Dwight May,* Attorney General, for appellants.

Complainant files his bill for a perpetual injunction against the removal by defendants of a part of an old wharf and some sunken cribs, designed as an extension thereof, situate, as he alleges, on lots 76 and 77, of private land claims, at the Sault Ste Marie, according to Whelpley's survey.

These lots, he alleges, he bought of Ebenezer Warner; the first, in January, 1863, and the second, in April of the following year, when Warner was in possession.

That there was a valuable wharf on the river front of said lots on the Ste Marie river more than twenty years before the filing of the bill, which continued and was used until replaced by the one now standing; and that, when complainant bought, there was a number of sunken cribs, filled with stones, designed as a foundation for a wharf in front of said lots, and necessary for that purpose; that the wharf now standing, was constructed about fifteen years before the filing of the bill, and the sunken cribs about five years. That there was a warehouse on said wharf; that the said wharf, warehouse and sunken cribs are not within the navigable waters of the river, and never have been, but are parts and parcels of said lots, and of complainant's property therein, and have always been peaceably occupied by the complainant, or some one through whom he claims title.

Complainant then alleges that defendants are insolvent; and that they are proceeding to destroy said wharf and cribs, thereby causing him irreparable injury: and prays answer under oath, and a perpetual injunction against their action.

It will thus be seen that complainant bases his case and his right to relief solely on the ground that the wharf and cribs are not, and never have been, within the navigable waters of the river, but are within the limits of the two lots mentioned. If he fails to substantiate this case, his bill must be dismissed, notwithstanding he may show other equities, which would have entitled him to relief had they been set forth. — *Thayer v. Lane, Walk. Ch. 200; Warner v. Whittaker, 6 Mich. 133; Bloomer v. Henderson, 8 Id. 395; Barrows v. Baughman, 9 Id. 213; Wurcherer v. Hewitt, 10 Id. 453; Peckham v. Buffam, 11 Id. 529; Perkins v. Perkins, 12 Id. 456; Moran v. Palmer, 13 Id. 367; See also Story Eq. Pl. §§ 241–2, 264–8; Lube Eq. Pl. 24, and note 1, 25–6.*

The evidence, we insist, proves that the obstructions sought to be removed are within navigable waters.

1. Any stream capable of being used in the transportation of any kind of property to market, whether in boats, rafts, or single pieces, whether guided by the hand of man or floated at random on the water, is a public stream, and subject to the public easement. — *Morgan v. King, 30 Barb. 9; Rhodes v. Otis, 33 Ala. 578; 2 Mich. 519.*

There can be no question, therefore, not only that the St. Mary River was navigable, but that the whole of the *locus in quo* was covered with navigable water; since the whole of it was not only capable of the inferior species of navigation, protected by the case of *Moore v. Sanborne,* but was sufficient for most species of water craft, and some part of it, for the largest class of lake vessels.

But complainant has introduced some evidence from which he would have the court infer that he has confined his improvements to the channel bank. We have to say of this:

There is no evidence of the existence of any channel bank distinct from the shore; but, on the contrary, it appears that there is a gradual deepening of the water from the shore line out. In any navigable stream the public right is limited to the channel. —*Porter v. Allen, 8 Ind. 1; Dalrymple v. Mead, 1 Grant's cases, 197; Williams v. Wilcox, 8 A. & E. 314; Hart v. Mayor &c. of Albany, 9 Wend. 584; Lorman v. Benson, 8 Mich. 25; Rice v. Ruddiman, 10 Id. 125.*

2. Where is vested the power of control over navigable waters?

This power is unquestionable in the state.—*Commissioners, &c. v. Withers, 29 Miss. 21; Spooner v. McConnell, 1 McLean, 345; Gilman v. Philadelphia, 3 Wallace, 713, 744; Pollard's Lessees v. Hagan, 3 How. 325.*

The state having the power to control, has also the power to improve; and she may judge of the expediency

of improving her public rivers, and execute and provide for executing such works of public improvement as she deems important.—*Same case; State Const. Art. 18, § 4; Gould v. Hudson R. R. Co. 6 N. Y. 522; Dutton v. Strong, 1 Black. 1—82; Houck on Rivers, 195, 6, 7, 8, 9, 200–1.*

In other words, the right to decide what improvements shall be made in navigable waters, is in the state, and not in the owners of the adjacent banks, or of any jury. The whole of the navigable stream being subject to the public easement, the state may at any time improve and make the whole more useful for the public service.

Private individuals can acquire rights adverse to those of the State only by legislative authority, or, within the canal limits, perhaps by permission of the board of control.

Any permanent appropriation of any part of navigable water by an individual, cannot be protected on the pretense that enough is still left for the accommodation of others.—*Hart v. Mayor &c. of Albany, 9 Wend. 584.*

The question whether navigation is impeded cannot be gone into by defendant; it is enough that he is creating an obstruction within the limits of the public highway.—*Same case, p. 596; Angell on Tide Waters, 208; Regina v. Randall, 1 Car. and M. 496.*

If any man could gain a permanent right in a public highway by simply encroaching upon it, it would certainly be very simple and easy to acquire such rights everywhere, but especially in the newer parts of the state; and the more unscrupulous and secret the proceedings of the trespasser, the greater would be the rights which he might acquire.

We have not been able to find authority sanctioning this rule; and, on the contrary, we think it clear that one thus encroaching on the public right of navigation does so at the peril of being removed at any time when the state authorities decide the removal necessary.

Private rights cannot be claimed adverse to the public,

short of an occupation of twenty years; but it has been held that even an acquiescence for twenty years in an obstruction will not prevent its being abated as a public nuisance.—*Renwick v. Morris, 3 Hill, 623.*

3. There is no showing of irreparable injury.

It is a general rule that an injunction will not be awarded to restrain a mere trespass. There must be something special in the case, like irreparable injury, which makes the remedy, at law inadequate, or equity has no jurisdiction And the facts which constitute the irreparable injury must be set forth.—*See Adams' Eq. 209, 210, and note; Willard's Eq. 381-3; 9 Wend. 577; 1 C. E. Green, N. J. Ch. 425; 2 Id. 76; 3 Id. 215, 293.*

The only ground upon which it is claimed in this case that the remedy at law is inadequate, and the injury irreparable, is the insolvency of defendants. But this is expressly denied by the answer, and no attempt is made to sustain the bill by evidence on this point.

4. If the bill is dismissed as to Brown, it must be dismissed as to the other defendants also. The claim by authority derived from Brown, and a successful defense by him, inures to their protection. — *Buchoz* v. *Lecour, 9 Mich. 234; Ross* v. *Davis' Ex. 4 J. J. Marsh. 386; Harrison's heirs v. Devennah, 2 Bibb, 349; Clason v. Morris, 10 Johns. 524.*

*L. S. Trowbridge,* solicitor for complainant and appellee.

1. The deeds of the complainant from his grantor are alleged to be without consideration, and in trust, but those allegations are entirely unsupported by proof, and being only on information, and not responsive to the bill cannot prevail, unsupported by proof, against the positive sworn statements of the bill.

But the defendants are in no position to question the consideration of these deeds. It does not concern them:

they admit that the legal title passed to Ryan, and his possession, which is really the only matter in issue, is clearly established by the proof.

2. The defendants, however, set up in their answer a right to remove the structure in question, like a plea of grant or title to the premises in question, under the Act of Congress of August 26th, 1852, granting to the State of Michigan a certain strip of public land 400 feet wide, on which to build a canal.

In answer to this it is submitted that, even if this plea were sustained by the proof, it would not justify defendants in ousting the complainant of his peaceable *possession*, by a *forcible entry*. The law provides an entirely different method for trying titles.

Lots 76 and 77 are *private* property. The forty years possession of the complainant and his grantors would presume a grant. But more than this: these claims have been recognized, adjudicated and allowed as such, and as to the Government title, *appropriated* under the Act of Congress of Sept. 25th, 1850, to those entitled, and for the purposes therein provided for.

A grant may be made by a law as well as by a patent, and confirmation by a law is as fully to all intents and purposes a grant, as if it in terms contained a grant *de novo*. *Strother vs. Lucas, 12 Peters, 454; Stockton vs. Williams, 1 Doug. (Mich.) 546.*

But, again: The premises and structures in question are not embraced in the canal grant.

That was a grant of a strip of land 400 feet wide "through the public lands known as the Military Reservation at the Falls, at St. Mary's River." This is the whole extent of the land granted, on which to locate the canal. *10 U. S. Stat. at Large, 35.*

The premises in question constituted no part of the Military Reservation, and the grant did not, and could not include them. The Military Reservation was surveyed

and laid out at the same time, and under the same Act of Congress, as private claims 76 and 77. The canal grant was a mere gift from the United States to the State, *pro tanto*, towards the construction of the canal.

If the State should desire to appropriate private rights and property situate outside of the limits of the gift, in finishing or improving the work, it is left to acquire such rights and property in a legal and constitutional way.

This point is, of itself, sufficient to put an end to the defense of title or right, under the canal grant.

3. It was urged on the trial in the Court below that, because the premises in question are outside of the limits of private claims 76 and 77, as marked on Whelpley's map, the complainant had no right to the possession of them.

The owner of the bank is entitled to every beneficial use of the soil under the river, which can be exercised with a due regard to the public easement. — *Lorman v. Benson, 8 Mich. 18; 10 Id. 125.*

It will not be denied that the premises in question are, at least in front of private claims 76 and 77, as shown by Whelpley's map, and they come clearly within the decisions above quoted.

It may be urged that, inasmuch as private claims 76 and 77, like others in the vicinity, are bounded on the water front with a designated line, therefore it was intended to reserve all outside of that line for the use of the government.

"Grants of land, bounded on rivers, or upon the margins of the same, or along the same, above tide water, carry the exclusive right and title of the grantee to the centre of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river." *3 Kent's Com., 427; Middleton v. Pritchard, 3 Scam., 510; Ex-parte Jennings, 6 Cow., 518; State v. Gilmanton, 9 N. H., 461; Starr v. Child, 20 Wend., Id., 149;*

*Canal Com's. v. the People*, 5 *Wend., Id., 423 ; Canal Com's. v. Kempshall*, 26 *Wend., Id., 404; Gavit v. Chambers, 3 Ohio, 495 ; King v. King*, 7 *Mass., 496.*

The right of the riparian owner to the stream is as sacred as other private property, and the State cannot appropriate the water to public uses by artificial erections or improvements, without making compensation. *The People v. Canal Appraisers, 13 Wendell, 355.*

According to all these authorities, the main question in any case is, who owns the shore? and whoever owns the shore, by whatever mode of expression or description, takes to the middle of the stream, unless there be decided language showing a clear intention to stop short at the water's edge.

4. The first ground of defense rests upon the theory that the structures in question are an impediment to the public right of navigation in St. Mary's River.

Under the decisions in *Lorman v. Benson*, and *Rice v. Ruddiman*, before referred to, the complainant and his grantors had a right to erect and maintain the structures in question, and the defendants had no right to remove them, unless they were impediments to the public right of navigation in said river.

This species of public right does not pertain to artificial highways, such as canals and the like. It pertains only to natural highways; that is, those created by nature, such as navigable rivers and the like.

The right is founded solely on the public good and interests, and it is therefore limited. Though absolute for public purposes, yet it extends no further than the public good requires. A stream cannot be considered a navigable stream unless the public good requires its use and servitude for some purpose; it may be for floating vessels, or it may be for floating logs, but it must be for some purpose common to the public.

It was urged in the court below, by the Attorney Gen-

eral, that the question whether any particular structure is an obstruction to navigation, is never a question of fact for a jury, but always a question of law for the court. This doctrine leads to such manifest absurdities that it would seem unnecessary to combat it at any length.

It is respectfully urged that such a question is always a question of fact under the law; a question of fact, too, depending upon various circumstances, such as the breadth of the stream, the depth of water, and especially the sort or kind of use for which the public good requires it.

The true test, then, of this public right of navigation in any particular case, will be, not the depth of water alone, nor the breadth of the stream alone, but both of these in connection with the use and purpose for which the stream is required by the public good.

5. The second ground of defense is, that the structures in question are an impediment to the navigation of the St. Mary's Falls Ship Canal.

In regard to this it is observed,

*First.* That such navigation has been created since the wharf was built, and it is now sought to be enlarged since the row of cribs (part of the Warner addition) was built.

*Second.* The public right of navigation pertaining to natural navigable rivers, which has been noticed, has no existence in artificial streams or channels. — *Moore v. Sanborn, 2 Mich. 524.*

CAMPBELL J.

Complainant being owner of certain dock property in the St. Mary's River at the foot of the Rapids, and just below the Canal entrance, had certain cribs, placed there by his grantor, intended as a foundation for additional docks on a line with the outer end of the old dock, which last, after the canal was built, had presented an angle to the line of direction of the canal. The new docks, as projected, were

intended to remove this angular projection, by building a dock in a line substantially coinciding in direction with the side of the canal as extended. The old dock, being at the head of river navigation, had its front at a considerable angle with the general direction of the stream, as the river widened out below the rapids, and vessels could proceed no further up stream; and such a position was favorable to turning. When the canal was opened, vessels entering it would pass the outer point of the dock, and at certain stages of the wind might have found inconvenience from being brought in contact with the angle, if of light enough draft to approach it. The new dock would have presented an even front parallel with the canal line.

The bill charged defendants with threatening and attempting to remove the cribs and the extremity of the original dock, and they justified as authorized to remove them, as obstructions to navigation; their authority being an order of the Canal Board to that effect.

The answer does not show, and the proof very clearly disproves the fact, that the original or extended dock would have been any obstruction to the natural navigation of the river. It appears quite as clearly, that the altered dock would have been more convenient for shipping after the canal was opened than the old one. And the testimony, so far as it shows any inconvenience to navigation as it stands, which is very slight, shows at the same time, that the inconvenience would not have arisen except for the action of the defendants, in dredging and removing the structures upon the premises concerning which the controversy arises. We think, if the questions in the case depended on the existence of a nuisance in fact to the improved navigation, that the facts show rather that a widening out of the canal entrance over these premises would be a desirable improvement, than that these docks, as left to be maintained under the decree of the court below, would amount to such nuisance. The Circuit Court dissolved the injunction as to the lower end

of the proposed addition, which would have presented an angle at the east end (and concerning which there might have been more controversy, if the rights of the parties depend on the · riparian theory asserted by the defense), and only maintained it as to the rest.

The answer set up, but without any proof on the subject, that Ryan, the complainant, received his title from the former owner, Warner, without consideration, and upon a trust for his benefit. But defendants are in no wise concerned with such an inquiry, and a voluntary deed, without consideration, can only be avoided by some one having equities against it.—*Jackson v. Cleveland, 15 Mich. 94.*

The case, therefore, stands upon the rights of the complainant as a riparian owner, and those of the state as proprietor of the canal, and also as guardian of the rights of the public. And the defense rests not only upon a general denial of the rights of riparian owners to improve their property by wharfage, but also upon an assertion of proprietorship in the state of the property embraced within a strip four hundred feet wide, which is claimed to extend down the River over the lands in dispute.

Unless very clearly confined within less limits by the terms of the grant, we have held the settled law of this state recognizes every ownership of lands upon streams as extending over their bed, to the middle of the stream, when it is a river. Any erection which can lawfully be made in the water within those lines belongs to the riparian estate. And the complete control of the use of such land covered with water is in the riparian owner, except as it is limited and qualified by such rights as belong to the public at large to the navigation, and such other use, if any, as appertains to the public over the water.— *Lorman v. Benson, 8 Mich. 18; Rice v. Ruddiman, 10 Id. 125.*

The complainant's title is not shown to have been restricted in any way, except as it would thus be subject to any rights of the public in the use of the stream. And so

far as the strip of four hundred feet wide is concerned, it never approached this land. It is granted by the act of Congress providing for the canal, as a part of the lands included in the Military Reservation, through which the canal was to be built; the act giving the right of way, and granting that width of land for its location and that of the necessary appurtenances.— *10 L. of U. S. 35–36.* There is nothing in the act assuming to override any private rights, or to include in this grant any land outside of the Reserve· It had been for many years a disputed point whether the State could cross the Reserve without permission, and if it could, there might have been difficulties in the way of condemning land, not being a part of the ordinary domain, but set apart for public purposes, and supposed to be withdrawn from plenary local jurisdiction. This grant removed any doubts upon this subject, but the United States did not and could not give the state any control over private property. That is always subject to the eminent domain for public improvements, and the state authority on that subject was already paramount; but, in order to take property for public purposes, it must be paid for. And, if the state should set up any proprietary rights over the property involved in this litigation, they can only be maintained upon proof of a valid grant, or legal appropriation upon an inquest in form of law.

The controversy, therefore, is narrowed down to the single inquiry, whether the defendants are justified in removing the structures of complainant as unlawful obstructions to navigable water, and as nuisances which they are authorized under the direction of the Canal Board to abate.

That board has such a control over the canal and its approaches, as to be authorized to remove such obstructions as are unlawful. But they have not, and could not have, any such judicial authority as to make their finding of any conclusiveness whatever, upon the fact of illegality. Such action must be had at their peril, and can never

justify themselves or others in interfering with any rights lawfully existing. They become wrong-doers as soon as they attempt to interfere with private property lawfully existing where they assail it.

The defendants claim that this property was in fact unlawfully placed in the stream, and within the jurisdiction of the board to remove. And it is asserted that every erection in the water is unlawful, as interfering with the right of navigation, which extends over the whole stream to the shore.

In those waters whose beds are public, and not private property, erections by riparian owners are unlawful, not because they are nuisances, in the proper sense of the term, but because they are encroachments on the public domain, and they are as unauthorized as would be the erection of houses or barns upon public land away from the water, by an adjoining landholder. But, where the ownership is private, and the public rights are simply easements or privileges upon it, the owner may do what he pleases, so long as it does not injuriously affect the public enjoyment. On land, where roads are laid out of a prescribed width, the law or the authorities having determined that width to be desirable, the right to encroach upon the way cannot be very extensive. But where the way exists in a watercourse, whose boundaries are variable and laid down without human intervention, the extent to which private improvements are compatible with the public use must depend upon circumstances, and must always be a question of fact. The owner's use is lawful until shown to be unlawful. It is plain enough that there are streams which cannot safely be encroached upon at all, while there are others so considerable that they could not be appreciably injured by a very extensive system of dockage or other erections in their beds.

The rights of the public for purposes of navigation must be appurtenant to the ordinary means of navigation. Small

boats can land where large ones do, but large ones cannot go where small ones can. It would be absurd to apply rules to the enjoyment of rights of navigation, as if canoes and scows, instead of ships and steamers, did the business of the country. If wharves and similar conveniences were not allowed upon our large streams, the shipping business would become practically worthless. It can never be unlawful for a land owner to make such wharves and landings as will accommodate all vessels ordinarily using the stream, unless there are some exceptional circumstances, as narrows, bends, or the like, which may in particular cases render his structures improper. Then the private right must yield to the public right. But where they do not conflict, there is no wrong done.

In the case before us, the original wharf went out into the stream as far as the proposed extensions. No vessel could pass above it, as it was just below the Rapids, and was the extreme upper limit of navigation. For all practical purposes the navigable stream began there.

It is admitted that before the canal was built, the wharf was a. necessity, and operated as a very great convenience to vessels. And from the end of the wharf to the old shore line, even if it had been deep water, the space was not more than an ordinary steamer's length, while, in fact, the proof shows that it approached shoal water so nearly, that at that point the water, which was deeper lower down, was too shallow to accommodate large vessels. There was nothing which could be called navigable water available above it.

This structure being lawful, and any additions which could have been made to it above, being in no way adapted to interfere with navigation, the State undertook, not to improve the navigation of the river, which practically ended there — the Sault being an insurmountable obstacle — but to make an artificial water-course in the shape of a canal, to connect the waters above the Falls with the stream below. This canal is in no sense a part of the river. It is as dis-

tinct from it as if the waters it connects were two separate streams. The rapids severed the upper and lower waters as effectually as if they flowed in different channels. The canal is an independent water-way, like a turnpike, which can only be used upon such conditions as the State, under the Congressional grant, might lawfully impose. The premises in question are not within it, and have never been assumed under the eminent domain for public use. The erections are not charged in the answer to obstruct any but canal navigation, and the proofs show that such is the only effect, so far as they are obstructions at all.

The State has no more right to interfere with private property without compensation, to make or improve a canal, than it has for a road upon land. And if the canal entrance is desired to be made wider, and the widening is over private property, which, in the absence of the canal, could have been kept improved without any impropriety, the State may unquestionably have it condemned by some process of law provided for the purpose, or may purchase it of the proprietor; but it cannot be taken arbitrarily. It is as much the owner's freehold as if it were upland.

It was suggested on the argument that these improvements were prohibited by section 4, article 18, of the Constitution of 1850, which declares that "No navigable stream in this State shall be either abridged or dammed without authority from the Board of Supervisors of the proper county, under the provisions of law."

The constitution, as reported in its several stages, and as published, with the joint certificates of the Secretary of State, and Mr. Swegles, principal secretary of the convention, as having been enrolled and signed, uses the word "bridged" instead of "abridged," which latter is a word not commonly used in such connection.—*Convention Debates, XXXVII, 909, 828, 830, 831.*

Whichever may be the correct reading, it is, we think, plain that this provision refers only to such streams as are

wholly within the state, and which at any given point must be under the control of one or more boards of county officers, instead of in part subject to the jurisdiction of a foreign country, with which no board of supervisors could lawfully treat or hold any official intercourse. The provision was adopted as relating solely to our internal police, where the authorities acting under state law could entirely regulate the use of the stream for the purposes proposed.

It was also claimed that the injury complained of was not such as to authorize the interference of a court of equity. But, where a trespass is calculated to do permanent damage to the freehold, the jurisdiction has always been exercised, and the circumstances of this case show that the injury must be very serious if permitted. It is not necessary to consider the insolvency of the defendants, for the remedy does not depend upon it. The case also involves an abuse of authority by public officers and agents, under color of office; and ever since the case of *Osborn v. Bank of U. S. 9 Wheat. 738*, it has been held that such official oppression would make it proper to interfere upon a less grievance than would justify proceedings on private misconduct, for reasons that are too obvious to require explanation. But, as before stated, the injury itself is, in this case, such as to give jurisdiction, independent of the position of the actors.

As complainant has not appealed, we cannot consider the propriety of the decree dissolving the injunction as to the cribs below the old dock. But the decree as made against the defendants must be affirmed, with costs.

Christiancy and Graves JJ. concurred.

Cooley Ch. J. did not sit, having been of counsel.