## SCRANTON v. WHEELER.

*(Circuit Court of Appeals, Sixth Circuit. September 5, 1893.)*

### No. 103.

1. CIRCUIT COURTS — JURISDICTION — ACTION AGAINST AGENT OF THE UNITED STATES.

    The circuit court has jurisdiction of an ejectment suit by a landowner against an agent of the United States in charge of a public improvement which is alleged to be built on plaintiff's land, and where defendant sets up and relies upon the government's right and title the court may inquire and determine whether it is the superior title; but its judgment will not conclude or estop the United States, since the latter is not a party, and cannot be made a party without its own consent. Carr v. United States, 98 U. S. 433, followed. Stanley v. Schwalby, 13 Sup. Ct. Rep. 418, 147 U. S. 508, and Hill v. U. S., 13 Sup. Ct. Rep. 1011, distinguished.

2. CIRCUIT COURT OF APPEALS—JURISDICTION.

    Under the judiciary act of March 3, 1891, § 6, (26 Stat. 826, c. 517,) the circuit court of appeals has jurisdiction to review on writ of error the judgment of a circuit court in an action of ejectment by a landowner against the agent of the United States in charge of the St. Mary's ship canal, the piers of which are built upon the submerged land lying in front of plaintiff's lot; such suit involving questions as to the government's ownership and control of such submerged lands on the borders of the St. Mary's river.

3. NAVIGABLE WATERS—TITLE TO SUBMERGED LANDS.

    The title to lands lying under a navigable river entirely within the boundaries of a state is not in the United States, but in the state; and the test of navigability is not the flow of the tides, but navigability in fact.

4. SAME—UNITED STATES LAND PATENTS.

    A patent of the United States, conveying land lying upon the borders of a navigable river within the boundaries of a state, conveys no title to any land lying under the stream, since the United States had no title thereto.

**5. SAME—EFFECT OF STATE LAWS.**
Where, however, the law of the state, as an incident to the ownership of. riparian lands, attaches thereto the legal title to the submerged lands, extending to the thread of the stream, as in Michigan, such title will accrue to one who receives· from the United States a patent to the riparian lands.

**6. SAME—REGULATION OF COMMERCE.**
The title which a state has to lands lying beneath its public navigable rivers is held subject to a high public trust, to forever preserve them as public highways, and is subject to the power of congress to regulate commerce among the states; and, if this title is passed by the local laws to riparian proprietors, they take it subject to the same trust and to the same power.

**7. SAME—EXTENT OF POWER—RIGHT TO TAKE SUBMERGED LANDS.**
The right of congress to regulate commerce involves the right to regulate navigation, and this, in turn, involves the use of submerged lands, in so far as such use is essential to the maintenance of the public highway; and hence the title of the riparian owner is subject to the right of congress to occupy the submerged land, without compensation, for the erection of structures in aid of commerce between the states, and it is immaterial that such structures are placed in shallow water, near the shore, so as to interfere with the owner's access to deep water.

In Error to the Circuit Court of the United States for the Southern Division of the Western District of Michigan.

At Law. Action of ejectment by Gilmore G. Scranton against Eben S. Wheeler. The circuit court directed a verdict for defendant, and entered judgment accordingly. Plaintiff brings error. Affirmed.

Statement by LURTON, Circuit Judge:

This suit was brought in ejectment in the circuit court for the county of Chippewa, and was removed by the defendant to the United States circuit court for the western district of Michigan, southern division, where it was tried in September, 1892. The premises described in the declaration, and sought to be recovered, are "an undivided one-half interest in private land claim number three, Whelpley's survey, in the village of Sault Ste. Marie, Mich., including .therein that portion of the land beneath the waters of St. Mary's river, from the river bank on said lot to the thread of the stream of said river, which forms a part of said lot, and all riparian rights belonging and attached thereto, and being a part thereof."

The real controversy is not over any of the dry land embraced within the lines of private claim No. 3, as defined by the survey thereof, but concerns the riparian rights appurtenant thereto, which, it is claimed, have been invaded by the construction by the United States of one of the piers which form a part of the St. Mary's Falls ship canal. The defendant in error has no personal interest in the controversy, and is in possession of the pier in question simply as an employe of the United States, being the superintendent, and in charge, of the canal. For many years prior to 1850, the lands, in part at least, at the locality in question, were occupied by parties who had .no title thereto, but claimed equitable rights by virtue of long-continued possession. Repeated attempts were made to obtain recognition of their rights from congress, but prior to said date they were unavailing. In 1850, however, congress passed an act (9 ·Stat. 469) which provided that the register and receiver of the land office at Sault Ste. Marie should be empowered and authorized to examine and report upon claims to lots at Sault Ste. Marie, according to the provisions of the act, and pursuant to instructions of the commissioner of the general land office. The second section of the act provided that: "The said commissioner shall cause the register and receiver to be furnished with a map, on a large scale, of the lines of the public surveys at the Sault Ste. Marie, and it shall be the duty of the secretary of war to direct the proper military officer, on application of the register and

receiver, to designate or cause to be designated, upon the map aforesaid, the position and extent of lots necessary for military purposes, as also the position and the extent of any other lot, or lots, which may be required for other public purposes, and also the position and extent of the Indian agency tract, and of the Indian reserve." Section 7 of the act provides that, on the completion of certain preliminary maps and abstracts by the land officers, the surveyor general at Detroit should dispatch a skillful deputy to the Sault Ste. Marie, and "that he shall proceed forthwith to lay off and survey the village of Sault Ste. Marie into town lots, streets, avenues, public squares, out-lots, having regard to the lots and streets already actually surveyed, existing or established, and having regard also to the existing limits and extent of lots covered by the claims which shall have been adjudicated by the register and receiver; and after such surveys shall have been completed, the aforesaid deputy shall prepare a plat, exhibiting, in connection with the lines of the public surveys, the exterior lines of the whole village, also the squares, individual lots, and public lots, and also the out-lots, designating the lots reserved for military or other purposes, according to the extent and limits of the same, as fixed by the proper military officers," etc.

This survey was made by Thomas Whelpley in 1855, and by it the land in controversy is located and described as "Private Land Claim Number Three." The plat and survey were approved in September, 1855, as recited in the patent of the land made by the United States in 1874. The pier, as originally built, crossed a part of the riparian frontage of private claim No. 3. The field notes of the survey made by Thomas Whelpley show that private claim No. 3 was described by metes and bounds, and that one boundary was "along the right bank of Ste. Marie river." This claim was patented by the United States to Samuel Peck and the heirs of Franklin Newcomb, October 6, 1874, and was described by reference to said survey. This grant was in these words and figures:

"The United States of America: To all to whom these presents shall come—Greeting: Whereas, under the provisions of the act of congress approved the 26th day of September, 1850, entitled 'An act providing for the examination and settlement of claims for land at the Sault Ste. Marie, in Michigan,' the claim of Samuel Peck and the heirs of Franklin Newcomb has been confirmed to a tract or parcel of land designated on the connected plat of survey, approved under the date of September 4th, 1855, by the surveyor general at Detroit, made pursuant to the act aforesaid, as lot number three, containing nineteen acres and forty-five one-hundredths of an acre, in section one, in township forty-seven north, of range one west, and in section six, in township forty-seven north, of range one east, in the district of lands subject to sale at Marquette, formerly Sault Ste. Marie, in the state of Michigan. And whereas, there has been deposited in the general land office of the United States a certificate, No. 111, of the register and receiver at Marquette, Michigan, whereby it appears that payment has been made in full, according to law, of the amount of assessment on said claims: Now know ye: That the United States of America, in consideration of the premises, and in conformity to the provisions of the act of congress aforesaid, have given and granted, and by these presents do give and grant, unto the said Samuel Peck and heirs of Franklin Newcomb, and to their heirs, the tract or parcel of land above described, to have and to hold the same, together with all the rights, privileges, and immunities and appurtenances of whatever nature thereunder belonging, unto the said Samuel Peck and heirs of Franklin Newcomb, and to their heirs and assigns, forever. In testimony whereof, I, Ulysses S. Grant, president of the United States of America, have caused these letters to be made patent, and the seal of the general land office to be hereunto affixed. [Seal.]

"Given under my hand, at the city of Washington, the sixth day of October, in the year of our Lord one thousand eight hundred and seventy-four, and of the Independence of the United States the ninty-ninth.

"By the president.                                      U. S. Grant.

"By S. D. Williams, Secretary.

"L. K. Lippincott, Recorder of the General Land Office."

By an act of congress approved August 26, 1852, (10 Stat. 35,) there was granted to the state of Michigan a strip of land 400 feet in width through the military reservation at Sault Ste. Marie, to be used for the construction of a ship canal at that point, and by the same act 750,000 acres of land were granted to the state to aid in its construction. The act provided that the selection and location of the site should be subject to the approval of the secretary of war. The site selected under the ·act was so approved, in 1853, by Hon. Jefferson Davis, then secretary of war. The canal was begun in 1853, and completed, as originally constructed, in 1855. The river in front of private claim No. 3 was navigable in its natural state, but immediately above were the rapids and falls, to avoid which the canal was built. This river, with its connecting waters, forms a very important highway for interstate and international commerce.

By act of congress of August 14, 1876, (19 Stat. 132,) the sum of $130,000 was appropriated for the repair, preservation, construction, and completion of this canal, "to be expended under the direction of the secretary of war." The plan of the work was adopted in the spring of 1877 by the corps of United States engineers and the war office. The construction of the pier in question was commenced in 1877, and completed in 1881. Congress has at all times recognized the national character of the work, making at different times very large appropriations for the canal. 16 Stat. 224, 402. In 1881 the state of Michigan transferred the canal to the United States. See How. St. § 5502. The canal was built entirely within the military reservation belonging to the United States, and, if it infringes upon plaintiff's rights, it is purely because it crosses more of his riparian frontage than did the piers of the canal which was there at the time of the confirmation of his title to private claim No. 3, in 1855. Upon these facts the court below directed a verdict for the defendant.

Harlow P. Davock, (John C. Donnelly, of counsel,) for plaintiff in error.

Lewis G. Palmer, U. S. Atty., and James B. McMahon, Asst. U. S. Atty., for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SWAN, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

There are two preliminary questions for decision: (1) Is this a suit against the United States, or one by which it will be concluded? (2) If the circuit court obtained jurisdiction to entertain and determine the cause, did an appeal lie to this court from its judgment?

1. Upon the submerged land forming the bottom of St. Mary's river, the government has erected a pier in front of the upland owned by him. The pier covers the entire water front of plaintiff, and is upon and within the riparian rights which he sets up. The pier is a prolongation westward, into deep water, of the banks of the government canal, shelters the Lake Superior entrance to the canal, and is such an extension thereof as to cut off the plaintiff's direct access to deep water. The defendant is the superintendent of the canal, and the officer in charge and possession of the pier, holding same for the government. The suit is one in ejectment, and the sole defendant is this agent and official of the government. His defense is that the government had a paramount right to place the pier where it stands; that, under the power conferred by the constitution over interstate commerce, the control of the government

of the United States over navigable waters thereof is absolute and conclusive, and that the title of the plaintiff was and is subordinate to the power of the United States to provide for the safe and convenient navigation of the St. Mary's river; that it might, therefore, lawfully erect within the banks of the river, and upon the permanently submerged bottom thereof, such dams, piers, and lighthouses as will, in its judgment, contribute to the use of said river by interstate and international commerce. Can the merits of this justification set up by defendant be determined, or must we, upon the suggestion that the defendant holds under the right and title of the United States, desist from inquiring whether that title thus interposed is a good and sufficient answer to the title and right of the plaintiff?

Except where congress has provided, the United States cannot be sued. This proposition is axiomatic. But the doctrine has no application to officers and agents of the United States, who, while in possession, are sued in ejectment by one claiming the title and right of possession. When such officer and agent is sued, and he undertakes to justify and defend his possession by setting up and relying upon the title and right of the United States, a judicial question is presented; and the court may inquire into such title, and determine whether it is the superior right and title, and render judgment as the right may appear. This has been the well-settled practice and rule of the United States court, and in the well-considered case of U. S. v. Lee, reported in 106 U. S. 196, 1 Sup. Ct. Rep. 240, the doctrine was thoroughly considered, and the cases elaborately reviewed, by Mr. Justice Miller, who delivered the opinion of the court. When a suit may be conducted alone against the party in possession, as is the rule in ejectment, the person under whom the defendant claims is not a necessary party. The judgment in this case will not conclude or estop the United States, for the reason that it is not a party, and cannot be made a party without its consent. Carr v. U. S., 98 U. S. 433.

In U. S. v. Lee the court said, in regard to the effect of the judgment in that case:

"Another consideration is that since the United States cannot be made a defendant to a suit concerning its property, and no judgment in any suit against an individual who has possession or control of such property can bind or conclude the government, as is decided by this court in the case of Carr v. U. S., already referred to, the government is always at liberty, notwithstanding any such judgment, to avail itself of all of the remedies which the law allows to every person, natural or artificial, for the vindication or assertion of its rights. Hence, taking the present case as an illustration, the United States may proceed by a bill in chancery to quiet its title, in aid of which, if a proper case is made, a writ of injunction may be obtained; or it may bring an action of ejectment, in which, on a direct issue between the United States as plaintiff and the present plaintiff as defendant, the title of the United States could be judicially determined, or, if satisfied that its title has been shown to be invalid, and it still desires to use the property, or any part of it, for the purposes to which it is now devoted, it may purchase such property by fair negotiation, or condemn it by a judicial proceeding, in which a just compensation shall be ascertained and paid according to the constitution." 106 U. S. 222, 1 Sup. Ct. Rep. 262.

That decision, upon its reasoning, was sound, and meets the approval of this court. The constitutional provision that "no person * * * shall be deprived of life, liberty or property without due process of law, nor 'shall private property be taken for public use without just compensation," finds its strongest safeguard, and most efficient vindication, in the doctrine so ably presented by the learned judge who spoke for the majority of the court in that case. The attention of the court has been called to the late decisions of the same court in the cases of Stanley v. Schwalby, 147 U. S. 508, 13 Sup. Ct. Rep. 418, and Hill v. U. S., (decided May 15, 1893,) 13 Sup. Ct. Rep. 1011.

In the first of these cases, (Stanley v. Schwalby,) the suit was an action of trespass to try title. The property involved was the military post at San Antonio, Tex. The defendants were Gen. Stanley and other officers of the United States. The suit, though it involved the title and possession of the United States to one of its military posts, was maintained. The reporter's headnote to the opinion is somewhat misleading, in so far as he states that, "for purposes of jurisdiction, there is no distinction between suits against the government directly, and suits against its property." The jurisdiction would not exist, unless permitted by congress, where it was directly against the government, while, as decided in that case, if the suit be against one in possession, and he claims under the government, the jurisdiction does exist. In that very case the court said in regard to the latter class of cases that "in these cases he is not sued as an officer of the government, but as an individual, and the court is not ousted of jurisdiction because he asserts the authority of such officer. To make out that defense, he must show that his authority was sufficient in law to protect him." In this class is included U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. Rep. 240, where the action of ejectment was held to be, in its essential character, an action of trespass, with the power in the court to restore the possession to the plaintiff, as part of the judgment; and the defendants Strong and Kaufman, being sued individually as trespassers, set up their authority as officers of the United States, which this court held to be lawful, and therefore is sufficient as a defense. The statutes of limitation were held applicable, upon the express ground that "as an action could have been brought at any time after adverse possession was taken, against the agents of the government through whom that was done, and by whom it was retained, the objection cannot be raised against them that the statute could not run because of inability to sue." 147 U. S. 519, 13 Sup. Ct. Rep. 422.

The case of Hill v. United States has no application. The action was directly against the United States, for a tort, and was sought to be sustained under the act of March 3, 1887, (chapter 359,) by which congress provided that the United States might be sued either in the court of claims or in the circuit court of the United States, in cases not sounding in tort. The case is in accord with U. S. v. Jones, 131 U. S. 1, 9 Sup. Ct. Rep. 669;

Langford v. U. S., 101 U. S. 341; U. S. v. Great Falls Manuf'g Co., 112 U. S. 645, 5 Sup. Ct. Rep. 306; and Great Falls Manuf'g Co. v. Attorney General, 124 U. S. 581, 8 Sup. Ct. Rep. 631.

2. We are of opinion that the plaintiff's right to an appeal or writ of error to this court was clear. Section 6 of the act of 1891, (chapter 517,) establishing the United States circuit court of appeals, provides "that the circuit courts of appeals * * * shall exercise appellate jurisdiction 'to review by appeal or writ of error final decisions in the district court and the existing circuit courts in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law." The preceding section specifies with particularity the cases in which an appeal lies direct from the district or circuit court to the supreme court. The case under consideration does not fall within any of the classes specified. The appeal must therefore be to the circuit court of appeals.

3. This brings us to a consideration of the claim and title of the plaintiff to the locus in quo. The terra firma owned by him is not involved. What is his title to the submerged land in front of his undisputed upland? The canal pier was constructed upon land permanently submerged under some five feet of water. The structure was most manifestly a necessity to the safe and convenient use of the canal. The canal was a necessity to the safe navigation of a great public highway, of which it forms a part. The commerce passing through it is equaled only by that of a few of the great navigable streams of the world. Has the plaintiff such a title to the land lying between the shore of this great highway of commerce and the middle thread of the stream as to make the defendant a trespasser, and the structure placed there in aid of navigation a nuisance, which plaintiff, as the owner of the adjacent shore, may abate and remove? Must the United States, before building piers, lighthouses, and other structures in aid of navigation, condemn and purchase the beds of navigable streams and inland seas upon which such improvements must be supported? If the plaintiff has such a property right in the submerged land beneath the river as cannot be taken or used without just compensation, and by due process of law, for the purpose to which it has been devoted, then the defendant is a trespasser, and he cannot justify his occupation of the premises by the title and right of the government, whose servant he is. At the outset we may say that, if plaintiff's title to this submerged land depends upon a construction of the grant of the United States under which he holds, his pretensions to such a title as will support ejectment must fail. The field notes of the survey called for in the patent to Peck and heirs of Newcomb show conclusively that the land patented to him extended "along the right bank of the Ste. Marie river." The firm upland was alone surveyed and measured.

The rule of the common law was that the title of one owning land bordering on a river in which the tide ebbed and flowed extended only to the margin of ordinary high water. The title to

all land between the shores, and below ordinary high water, was vested in the crown. Above the ebb and flow of the tide, the title of a riparian proprietor extended to the middle thread of the stream. The ebb and flow of the tide in the short streams of that insular country was, in fact and law, the sole test of actual navigability. But in this country the situation is entirely different. A large majority of our rivers are navigable in fact which are wholly unaffected by tide, and many others are equally navigable above the ebb and flow, which affects them near the sea. The common-law test of navigability, said Justice Bradley in Barney v. Keokuk, 94 U. S. 338, "had the influence, for two generations, of excluding the admiralty jurisdiction from our great rivers and inland seas; and, under the like influence, it laid the foundation in many states of doctrines with regard to the ownership of the soil in navigable waters above tide water at variance with sound principles of public policy." In the case of The Genesee Chief, 12 How. 443, the common-law test of navigability was considered, and the doctrine established that the admiralty and maritime jurisdiction granted to the federal government by the constitution extended to all public navigable rivers and lakes, where commerce is carried on between the states, or with foreign nations. Subsequently, the same court, in The Daniel Ball, 10 Wall. 563, said, as to the test of navigability of rivers and inland seas, that "they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary mode of travel and trade on water." This definition was followed and affirmed in Packer v. Bird, 137 U. S. 673, 11 Sup. Ct. Rep. 210. Since The Genesee Chief Case, the courts of the United States have steadily held that the test of navigability was not the flow of the tide, but that navigability in fact furnished the standard by which jurisdiction in admiralty and riparian rights were to be determined under United States patents. Railroad Co. v. Schurmeir, 7 Wall. 272; Packer v. Bird, 137 U. S. 673, 11 Sup. Ct. Rep. 210.

The doctrine that the title to the submerged lands within the banks of navigable rivers belongs to the states, respectively, within which such rivers are situated, and not to the United States, was settled at an early day, and has never since been questioned. In Pollard's Lessee v. Hagan, 3 How. 219, it was held that a patent by the United States to lands in the bed of the Alabama river was absolutely void, inasmuch as the United States, by its acquisition of that part of Alabama through treaty with Spain, had never acquired any title to the soil under navigable rivers, and none had been conferred by the constitution of the United States. It was also held that new states coming into the Union entered it with precisely the same reservation as to the soil under their navigable waters as was the case with the states originating the Union. 3 How. 219. To the same effect are the cases of Martin v. Waddell, 16 Pet. 367, and Goodtitle v. Kibbe, 9 How. 471. It is true that

these cases involved the beds of streams affected by tides, but the principles upon which the cases rested applied equally to streams navigable in fact, and above the ebb and flow of the tide. In Barney v. Keokuk, supra, the court said, speaking of these cases:

"In our view of the subject, the correct principles were laid down in Martin v. Waddell, 16 Pet. 367; Pollard's Lessee v. Hagan, 3 How. 212, and Goodtitle v Kibbe, 9 How. 471 These cases related to tide water, it is true, but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of The Genesee Chief, 12 How. 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of 'navigable waters,' and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the states, by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its surveys and grants beyond the limits of the water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the states in which the lands were situated."

In the late case of Illinois Cent. R. Co. v. Illinois, it was expressly held that the ownership of, and dominion and sovereignty over, lands covered by the waters of Lake Michigan, though unaffected by the tide, belonged to the states within which such submerged land was situated. 146 U. S. 387, 13 Sup. Ct. Rep. 110. The effect and construction of a United States land patent must, in the very nature of the subject, be a question for the United States courts to determine for themselves, without reference to the rules of construction adopted by the states for their grants. Barney v. Keokuk, 94 U. S. 338; Packer v. Bird, 137 U. S. 661, 11 Sup. Ct. Rep. 210. It is deducible, therefore, from the decided cases:

First. That the United States never had or asserted any title to the land under the waters of the Ste. Marie river, and could not, by its grant, convey to a patentee any title whatever.

Second. That the only reasonable construction to be placed upon the acts of congress concerning the survey and sale of the public lands, and the settled line of decisions concerning such patents, would be to limit the effect of the patent under which the plaintiff holds to the terra firma bounded by the margin of the St. Mary's river. Railroad Co. v. Schurmeir, 7 Wall. 272; Packer v. Bird, supra; Barney v. Keokuk, supra.

We then have a case where the grant to plaintiff does not, by construction, extend his title to any part of the soil beneath the waters of the stream along which it lies. This brings us to a consideration of the effect of the law of the state of Michigan upon the title of the plaintiff. The title to the soil under the navigable rivers of Michigan remained in the state, as we have already shown. "If," as observed in Barney v. Keokuk, that state "chose to resign to the riparian proprietor rights which properly belong to it in its sovereign capacity, it is not for others to raise objections." This the state of Michigan has done. As an incident to ownership of lands on the margins of navigable streams, the law of Michigan attaches the legal title to the submerged lands under the stream compre-

hended within parallel lines extending perpendicular to the general trend of the shore along his land to the center of the stream. Ryan v. Brown, 18 Mich. 207; Lorman v. Benson, 8 Mich. 18; Boom Co. v. Adams, 44 Mich. 403, 6 N. W. Rep. 857. This, being the well-defined law of Michigan, is the law applicable to the rights of the plaintiff in this case, and controlling as to the locus in quo. Under the law of Michigan, the plaintiff is therefore seized of the legal title to the submerged land upon which the United States has constructed the pier in question.

But while the plaintiff, under the law of Michigan, is seised of the legal title to the soil under the water, yet, in the very nature of the property, such seizure is of the bare technical title. The state of Michigan was a part of the Northwest Territory ceded by the state of Virginia to the United States for the public benefit. The statute authorizing the cession, the deed of cession, and the ordinance of 1787, providing for the government of that territory, alike provided that the navigable waters of that cession should be "common highways and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and those of any other states that may be admitted into the Confederacy, without any tax, import or duty therefor." These limitations on the powers of the Northwest Territory, and afterwards upon those of the territory of Michigan, ceased to have operative force upon the state of Michigan, when admitted into the Union, in so far as their force depended upon the deed of cession or the ordinance of congress, or were in diminution of the powers attaching to the other states of the Union. When admitted into the Union, she entered on an equal footing with the original states, and could exercise over her rivers and lakes the same sovereign powers as pertained to the old states with respect to such subjects. But this provision concerning her navigable streams was precisely the limitation under which all such streams were controlled by the older states after the adoption of the present constitution. In Martin v. Waddell, 16 Pet. 410, the court said:

"When the Revolution took place, the people of each state became themselves sovereign, and in that character held the absolute right to all their navigable waters, and the soil under them, for their own common use, subject only to the rights since surrendered by the constitution."

By that constitution the states are prohibited from imposing any tonnage duty without the consent of congress. Article 1, § 10. And by the eighth section of the same article the states granted to the congress of the United States the power "to regulate commerce with foreign nations and among the several states." This power operates whenever congress elects to legislate upon this particular subject, as a limitation upon the power of the states over the channels of interstate commerce within the states.

In Gibbons v. Ogden, 9 Wheat. 196, Chief Justice Marshall said, as to this power to regulate commerce:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all other vested in congress, is

complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution. These are expressed in plain terms, and do not affect the questions which arise in this case. If, as has been always understood, the sovereignty of congress, though limited to specific objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in congress as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States."

In Gilman v. Philadelphia, 3 Wall. 724, the court said:

"Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by congress. This necessarily includes the power to keep them open, and free from obstruction to their navigation interposed by the states or otherwise; to remove such obstructions, when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of the evil, and the punishment of offenders. For these purposes, congress possesses all the powers which existed in the states before the adoption of the national constitution, and which have always existed in the parliament of England."

It must, from these constitutional principles, follow that the state of Michigan held the soil beneath her navigable rivers under a high public trust, to forever preserve them free as public highways, subject only to the power of congress to regulate commerce among the states. The legal title which, under her law, becomes vested in such proprietors, must be subject to the same public trusts, and therefore subordinate to the rights of navigation, and subordinate to the power of congress to control and use the soil under such streams whenever the necessities of navigation and commerce should demand it. The right of congress to regulate commerce, and, as an incident, navigation, remains unaffected by the question as to whether the title to the soil submerged is in the state, or is in the owner of the shores. A distinction must be recognized between that which is jus privitum, and that which is jus publicum. This private right is subordinate to the public right. The plaintiff holds the naked legal title, and with it he takes such proprietary rights as are consistent with the public right of navigation, and the control of congress over that right. This much seems expressly ruled in Illinois Cent. R. Co. v. Illinois. Such submerged lands can only be disposed of by the state when that can be done without injury to the interest of the public in the waters, and subject to the paramount right of congress to control their navigation so far as necessary for the regulation of commerce with foreign nations, and between the states. 146 U. S. 387, 13 Sup. Ct. Rep. 110. The right of access to deep water, which was considered in Atlee v. Packet Co., 21 Wall. 389, and Yates v. Milwaukee, 10 Wall. 497, and Gilman v. Philadelphia, 3 Wall. 724, is likewise a right subordinate to the power of the state and the federal government to control the stream in so far as necessary for purposes of commerce. In Atlee v. Packet Co. it was held that, though the right of access to deep water existed

in the defendant, Atlee, regardless of his title to the soil, and though this right carried with it the right to put in and maintain a pier to utilize the right, yet, if such pier interfered with navigation, it becomes a nuisance, and could be removed without compensation, if constructed without authority of the state or United States. In Yates v. Milwaukee the point of decision was that this right of access could not be arbitrarily destroyed or injured by a city ordinance condemning a pier as a nuisance; that it must be shown, by due process of law, to be a nuisance in fact, as affecting navigation, before it could lawfully be removed. In Gilman v. Philadelphia the doctrine that, in the absence of congressional regulation concerning the navigation of a river wholly within the limits of one state, that it was within the power of the state to authorize a bridge over the stream, as in itself an aid to commerce, was again announced, and Willson v. Marsh Co., 2 Pet. 245, followed and approved. The significance of that case, as it affects this, was the refusal to enjoin the erection of the bridge on the complaint of one owning land on the shores above, whose access to and use of the stream were thereby injured. His property had not been taken. The injury to him was consequential, and he was held to be without remedy. Here the plaintiff has sustained an injury which is wholly a consequence of the erection of a structure by congress in aid of the general and public right of navigation. If congress may lawfully use the soil as a support for such structures without acquiring the naked title outstanding in the plaintiff, then, for such injuries as are merely consequential, it is a case of damage without an actionable injury. A distinction exists between those cases where, under authority of the state, a structure has been placed in a navigable stream, such as a bridge, or lock and dam, as an improvement to the navigation of a stream wholly within its borders, and which is sought to be removed under authority of subsequent congressional legislation. In such case, the improvement, being by authority of law, can only be taken for public uses upon just compensation. This is the doctrine of the case of Monongahela Navigation Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. Rep. 622. In that case it was held that not only must the actual property of the owner in the structure, but his franchise also, must be paid for. The plaintiff in the case before us had made no improvements for either public or private uses. No property of his has been invaded, none has been taken. The title in him was subject to the public uses. He held the soil under the river subservient to the purposes of navigation. The right to regulate commerce involved the right to regulate navigation, and this, in turn, involves the necessary uses of the submerged lands, in so far as such use was essential to the maintenance of the public highway.

What is a proper exercise of this power of congress to aid navigation seems to be for congress to determine. The case of South Carolina v. Georgia, (93 U. S. 4,) is an illustration of the great discretion reposed in congress as to the selection of means proper

to the improvement or protection of such public highway. In that case it was decided that congress has the power to close one of several channels in a navigable stream, if, in its judgment, the navigation of the river will be thereby improved. The case did not turn upon the fact that the bill in the case was filed by the state of South Carolina, but was put upon a construction of the power of congress to determine the means by which the navigation of a river may be improved. See, also, the case of Pennsylvania v. Wheeling I. B. Bridge Co., 18 How. 421, and Wisconsin v. Duluth, 96 U. S. 379.

If the title had remained in the state, the conclusion would be the same. The state would hold subject to the public use, and its property right in the submerged soil of a navigable stream would be subservient to the power of congress to regulate navigation, and the use of such soil as a support for a structure in aid of navigation would not have been the taking of the private property of the state, within the meaning of the constitutional provision inhibiting it without compensation. This point was expressly ruled upon in a very able opinion by the late Justice Bradley in Stockton v. Railroad Co., 32 Fed. Rep. 19. The Hawkins Point Lighthouse Case, reported in 39 Fed. Rep. 77, was a case identical in principle to the one under consideration. The plaintiff, under a grant from the state of Maryland, was the owner of the fee in the submerged land under the Patapsco river. The United States erected a lighthouse supported on the soil owned by plaintiff. Suit in ejectment was brought, upon the theory that the keeper of the lighthouse was a trespasser; the site never having been condemned, nor any compensation paid. It was held, upon elaborate argument, that the United States, in thus erecting a lighthouse in aid of navigation, by authority of congress, was not taking private property without compensation. That plaintiff's title and ownership were necessarily subservient to the use of the same in aid of public navigation.

We have been conscious of the importance of the question, both to the government and riparian proprietors. This must be an apology for the great length to which this opinion has been extended.

The conclusion we have reached is that there is no error in the judgment of the circuit court. The plaintiff has no such ownership of the locus in quo as makes its use for the purposes to which it has been devoted a taking of private property, within the meaning of the constitution.

The judgment is therefore affirmed.