HIGH BRIDGE LUMBER CO. v. UNITED STATES et al.

(Circuit Court of Appeals, Sixth Circuit. July 2, 1895.)

No. 271.

1. EMINENT DOMAIN—COMPENSATION—CONSEQUENTIAL DAMAGES.

When proceedings are taken by the United States, under the act of August 1, 1888 (2 Supp. Rev. St. 601), to condemn lands for a lock and dam on a navigable river, in a state which, like Kentucky, has no statute relating to the condemnation of land for such purposes, the compensation to be awarded must be determined upon the principles of the common law, and no allowance for consequential damages can be made.

2. SAME.

Neither a temporary flooding of other lands than those taken, not amounting to a "taking" of the flooded lands, nor an anticipated change in the current of the stream, nor an anticipated increase of danger to the property of the landowner from fire during the construction, is a proper subject of compensation, each being a purely consequential injury.

3. SAME—SUBSEQUENT DAMAGE.

It seems that if, after such improvement is completed, other lands than those taken are found to be permanently flooded, a right of action for the value of such lands would arise, which would not be barred by the condemnation proceedings.

In Error to the District Court of the United States for the District of Kentucky.

This was a proceeding by the United States and W. M. Smith, attorney, against the High Bridge Lumber Company for the condemnation of certain lands. Judgment was entered in the district court awarding the defendant $4,750. Defendant brings error. Affirmed.

This was an action by the United States for the condemnation of 10,232 acres of land the property of the plaintiff in error, and necessary to the erection and maintenance of a lock and dam for the improvement of the Kentucky river. The proceeding was by petition, filed in the district court of the United States for the district of Kentucky. The suit was begun and prosecuted under and by virtue of an act of congress which authorizes the secretary of war to cause proceedings to be instituted, in the name of the United States, and in the United States circuit or district court of the district wherein such real estate is located, "for the acquirement by condemnation of any land, right of way, or material needed to enable him to maintain, operate, or prosecute works for the improvement of rivers and harbors for which provision has been made by law; such proceedings to be prosecuted in accordance with the laws relating to suits for the condemnation of property of the states wherein the proceedings may be instituted." That act, by section 2, provides that: "The practice, pleadings, forms and modes of proceedings in causes arising under the provisions of this act shall conform, as near as may be, to the practice, pleadings, forms and proceedings existing at the time in like causes in the courts of record of the states within which such circuit or district courts are held, any rule of the court to the contrary notwithstanding." Act Aug. 1, 1888 (2 Supp. Rev. St. 601). Kentucky has no statute providing for the condemnation of private property for any other than railway construction, and the only procedure in suits of this kind is that prescribed for the condemnation of lands for railroad purposes. Barb. & C. St. Ky. § 835 et seq.

The practice pursued in this case was that prescribed in the section above cited. Upon the filing of the petition describing the property sought to be condemned, the purposes to which it was to be put, and the authority for the application, an order was made requiring the defendant to appear and show cause why commissioners should not be appointed to assess the value of the land desired and the damages sustained by the owner. Upon appearance, and after argument, three commissioners were appointed. These commissioners, by the order of appointment, were directed to go upon the land and assess the

value and damages as therein directed, and report their finding in detail,—"that is, they will say what is the actual present cash value of the land condemned; then they will report the amount of damages, if any, that may result to the adjacent lands of said owners, and they will report in full in what said damages consist; then they will report the amount in value of the benefits that may result to the land, and in what said benefits consist. But they will not consider any damages that may result to adjacent property of defendant by reason of any overflow, or any other damages that may hereafter result by the construction or operation of said lock and dam, such damages not being considered in these proceedings."

The defendant, the High Bridge Lumber Company, was a corporation of the state of Kentucky, owning and operating a large sawmill upon the bank of the Kentucky river. To the order of the court instructing the commissioners as to the measure of valuation, the defendant then and there objected and excepted. The commissioners thus appointed filed a report in these words:

"The undersigned, commissioners appointed by the district court of the United States, district of Kentucky, as shown by copy of the order of court herewith attached and marked Exhibit D, after being duly sworn, as shown by Exhibits A, B, and C, hereto attached, have valued the land, containing 10,232 acres more or less, lying in Jessamine county, state of Kentucky, at thirty-five hundred dollars ($3,500). The commissioners find that this land is used occasionally for storing logs along the water front, and that the company has been renting the buildings located thereon to its employés for the sum of one hundred and seventy-five dollars ($175) per annum. This earning power and the occasional use of the land for storing logs, together with the value of the spring to the company, was the basis for the above finding. The adjacent land of the defendant lying down the river and west of the land condemned, is damaged to the extent of seven hundred and fifty dollars ($750). The taking and cutting this part of the land from that of the main property of the defendant prevents the advantageous use of the same as heretofore. This land was valued on the basis of $1,000, based on its earning power for the purpose for which it was used, and the commissioners consider that it would be damaged 75 per cent. The land adjacent to the land condemned and east of it up the river and on which the mill and lumber yard are located, the commissioners find: First. One hundred dollars ($100) for a fence necessary to the defendant to separate its property from that condemned. Second. The commissioners find four hundred dollars ($400) the cost necessary to level the ground for lumber storage purposes. Third. The commissioners further find fifteen hundred dollars ($1,500) for the extra expense the defendant would have to incur by reason of the extra hazard in the way of fire risk during the construction of the lock and dam. This was based on an advance of about one per cent. on the present rate of insurance. The property on hand was valued at $50,000, making it necessary for the defendant to pay out for such increased risk $500 per annum, and for three years (which time it is estimated it will take to complete the lock and dam) they would have to incur an expense of ($1,500) fifteen hundred dollars. The commissioners find that no benefit will result to the land. The commissioners have not considered any damages that may hereafter result by reason of any overflow, or any other damages that may hereafter result by the construction or operation of said lock or dam. The land sought to be condemned in this action is the property of the High Bridge Lumber Company, a corporation, and its principal place of business is at High Bridge, Jessamine county, Kentucky.

"C. C. Mengel, Jr.,
"L. H. Willis,
"W. W. Stephenson,
"Commissioners."

Exceptions to this report were filed by the plaintiff in error, in words and figures as follows:

"(1) The commissioners erred in not allowing the High Bridge Lumber Company damages for the depreciation, by the lock and dam number 7, of its plant situated upon the eastern end of its property adjoining the 10,232 acres of land sought to be condemned herein; that said plant will be diminished in value by reason of the building of the lock and dam number 7 at the point

at which the same has been located, being about 400 feet down the river from the lumber yard of the High Bridge Lumber Company, with the lock on the Jessamine county side of the river, on which side defendant's property is situated, to the extent of 25 per cent. of its value,—that is to say, in the sum of at least $10,000. (2) The commissioners erred in not considering any damages that may hereafter result to defendant by reason of overflow of the lands of the High Bridge Lumber Company in consequence of the building of the dam aforesaid. (3) The commissioners erred in not considering the damages that will hereafter result to the traffic and business of defendant, High Bridge Lumber Company, by the construction of said lock and dam. (4) The report of the commissioners is incorrect, incomplete, defective, and erroneous, because the court erred in instructing the said commissioners that they should not consider any damages that may result to adjacent property of defendant, High Bridge Lumber Company, by reason of any overflow or any other damages that may hereafter result by the construction or operation of said lock and dam number 7, and the court erred in adjudging that such damages are not considered in these proceedings. (5) The said report of the said commissioners is defective and incomplete, because the said commissioners failed to make any inquiry as to the location of the gateway of the dam, and to ascertain on which side of the river the gateway of the dam—that is to say, the lock pit—is to be situated. That the location of said gateway of the dam or lock pit is a material and important point in this proceeding, and the location of the same on the Jessamine county side of the river has been determined upon by the engineers of the United States in charge of said work, and that fact could have been ascertained by the said commissioners by application to said officers. The damages resulting to the High Bridge Lumber Company from the location and erection of said gateway of the dam, or lock pit as aforesaid, could have been ascertained by the said commissioners. It was the duty of the said commissioners, under the instructions of the court, to report the damages that will result to the business and property of the defendant by reason of the location and erection of said gateway or lock pit as aforesaid, and the consequent changing of the traffic of the Kentucky river at that point. That the whole business of the High Bridge Lumber Company will be seriously affected thereby, and great damage will result to it in the operation of its business, from the fact that it will not be able to supply its mill with logs without great cost and inconvenience, and consequent loss and damage. That the business of said mill from the river will be changed to such an extent that it will be impracticable for the High Bridge Lumber Company to bring its logs down the river to the mill, except at great expense, and by the construction of a boom, and the employment of a large force of men, on heavy wages, and the profits of its business would be thereby greatly diminished, and the value of its plant and business impaired, to the extent aforesaid. (6) The lands of defendant will be overflowed by the damming of the Kentucky river, as aforesaid, and its property and plant damaged in a large sum, to wit, in the sum of $2,000. The defendant will be compelled to change and reconstruct part of its mill plant, and be forced to cut down trees and clear its land on the said river, in order to get logs to its mill, and to maintain its landing for its supply of logs for its business, and the commissioners erred in not allowing defendant damages for such necessary changes of its plant and manner of doing business, and such overflow of its lands. (7) The boiler and a large and indispensable portion of the machinery of the High Bridge Lumber Company is situated in a cellar under the mill, and the overflow of the water which will result from the construction of the dam, and the operation thereof, will submerge the said boiler and machinery, and ruin the same, and stop the operations of said mill, to the damage and injury of the said High Bridge Lumber Company in a great sum of money, to wit, $——; and the commissioners erred in not assessing and allowing to said lumber company damages for such overflow and destruction and damage of said boiler and other machinery."

The United States excepted to so much of the report as awarded to the plaintiff in error the sum of $1,500 for increased cost of fire insurance,

deemed a result of increased danger by fire during construction of the lock and dam. All the exceptions filed by plaintiff in error were overruled. The exception taken by the government was sustained. The report thus corrected was confirmed, and judgment awarded accordingly. The action of the court in overruling the exceptions of the plaintiff in error, and its action in sustaining the exception filed by the defendant in error, is the subject of the assignment of errors filed by the plaintiff in error.

Pirtle & Trabue and Bronough & Bronough, for plaintiff in error.
W. M. Smith, U. S. Atty., for defendants in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The several assignments of error present substantially but one question, and that is, whether the district judge erred originally in instructing the commissioners "not to consider any damages that may result to adjacent property of the defendant by reason of any overflow, or any other damages that may result by the construction or operation of said lock and dam." The anticipated diversion of the current of the stream from one side of the river to the other, thereby inconveniencing the conduct of the business of the High Bridge Lumber Company, and the anticipated raising of the level of the stream causing overflows and a consequent damage to its mill machinery and to the use of its adjacent lands for the purposes of its business, are manifestly injuries not directly the result of the taking of the small parcel desired by the government, but damage anticipated as consequent upon the construction and maintenance of a lock and dam in the Kentucky river. If the land condemned had been acquired by purchase, the same result to the remainder might be as well anticipated; or, if the condemned parcel had belonged to a different owner, the High Bridge Lumber Company would be subjected to the same class and kind of injuries, as a result of the improvement of the river. The supposed increase of risk from fire during the work of construction belongs to the same class of consequential damages. The question at last is this: Do such damages constitute, within the meaning of the constitutional limitation upon the taking of private property for public uses, any part of the value of the land condemned, or any part of that "just compensation" which the owner is entitled to demand before he can be deprived of his property?

The commissioners have already allowed satisfactory compensation to the owner for any impairment of the value of the remainder of its land by reason of the relation of the part taken to the remainder of the owner's tract. This was obviously just. A strip carved out of a tract, in such a way as to divide the remainder, might very seriously affect the enjoyment of the parts not taken. If thereby the value of the adjacent and remaining land is impaired, such impairment constitutes an element to be considered in assessing the value of that which is condemned. The relation of that taken to that which is left is, therefore, a proper element to be estimated in

assessing a "just compensation." Cooley, Const. Lim. side pp. 565–568.

But plaintiff in error insists that the district judge should have gone further by allowing anticipated damages to the remainder consequent upon the use to which the condemned parcel is to be put. Let us consider the purpose for which this land is desired, and the use to which it is to be put. The Kentucky river is a navigable stream, accessible from states other than that in which it lies, and, therefore, within the constitutional powers of congress over the navigable waters of the United States. Congress may rightfully open and keep open such a river for the public benefit, and may make such improvements as its discretion may dictate for the purpose of maintaining its safe and profitable navigation. Gilman v. Philadelphia, 3 Wall. 721–725; Scranton v. Wheeler, 16 U. S. App. 152, 6 C. C. A. 585, 57 Fed. 803. The power to lock and dam such a stream in the interest of navigation is unquestioned. Now, if it be assumed that the gate of this structure shall be so placed as that the direction of the current of the stream will be changed in a way which shall impair the usefulness of the lands of the plaintiff in error above the dam, and that, as a further consequence of the presence of the dam in the river, the level of the water above it shall be so raised as to overflow the lands of riparian owners, including plaintiff in error, may such consequential damages to plaintiff in error be considered in estimating the value of the parcel now condemned? The well-settled rule in respect of consequential injuries resulting from the prudent and skillful construction of public works by the government or the state, or those acting under legislative authority, is that for such damages no action will lie unless expressly conferred by statute. Cooley, Const. Lim. side pp. 541–543; Transportation Co. v. Chicago, 99 U. S. 635–641; Railroad Co. v. Bingham, 87 Tenn. 522, 11 S. W. 705; Smith v. Washington, 20 How. 135. In Transportation Co. v. Chicago, cited above, this doctrine is very clearly stated. Justice Strong sums up the discussion by saying:

"The remedy, therefore, for a consequential injury resulting from the state's action through its agents, if there be any, must be that, and that only, which the legislature shall give. It does not exist at common law. The decisions to which we have referred were made in view of Magna Charta, and the restriction to be found in the constitution of every state, that private property shall not be taken for public use without just compensation being made. But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action. This is supported by an immense weight of authority. Those who are curious to see the decisions will find them collected in Cooley on Constitutional Limitations (page 542 and notes). The extremest qualification of the doctrine is to be found, perhaps, in Pumpelly v. Green Bay Co., 13 Wall. 166, and in Eaton v. Railroad Co., 51 N. H. 504. In those cases it was held that permanent flooding of private property may be regarded as a 'taking.' In those cases there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession."

One difficulty in all such cases is to determine what are consequential damages, when a part only of a larger parcel belonging to the

same owner is sought to be condemned, and another grows out of the varying terms of statutes prescribing the nature of the damages which are to be ascertained as a condition upon which the right of eminent domain may be exercised.   In this case there is no statute prescribing the damages to be assessed.   The Kentucky statute concerns only the damages which are to be allowed as a condition upon which railroad corporations are allowed to condemn lands or materials necessary in railroad construction.   The provision in the act of congress heretofore cited, requiring condemnation proceedings to be prosecuted "in accordance with the laws relating to suits for the condemnation of property of the states wherein the proceedings may be instituted," has no application to a condemnation for river improvement purposes instituted by the United States, other than to require that the practice and proceeding shall, "as near as may be," be in accordance with like causes in the courts of record of the state within which such circuit or district court is held.   It is not to be conceived that congress intended that a legislative requirement, giving to an owner consequential damages when his land was sought to be appropriated by a railroad company, should have application when the United States undertakes to condemn land necessary for the improvement of navigation.   The right of eminent domain is a common-law right, inherent in every sovereignty unless denied by its fundamental law.   It is a right which exists in the federal government, and may be exercised by it within the states, so far as necessary to the enjoyment of the powers conferred upon it by the constitution.   Cooley, Const. Lim. 526; Kohl v. U. S., 91 U. S. 367; U. S. v. Jones, 109 U. S. 513, 3 Sup. Ct. 346.   Congress may create a special tribunal for condemnation purposes, adopt the tribunals of the states, or authorize purely common-law proceedings in the courts of the United States.   In the absence of direction by congress, as to the tribunal or mode of procedure, an action at common law will lie in the name of the United States in the district in which the land to be condemned lies.   Kohl v. U. S., 91 U. S. 367; U. S. v. Jones, 109 U. S. 513, 3 Sup. Ct. 346.   The only constitutional limitation upon this right of eminent domain is found in the provision which forbids the taking of private property for public purposes without just compensation.   That congress may delegate to state tribunals the power to fix and determine the amount of compensation to be paid by the United States for private property taken by them for public purposes, or adopt the rules of law prescribed by the state for that purpose, is not to be doubted.   The case of U. S. v. Jones, heretofore cited, arose under an act of congress which assumed all liability theretofore or thereafter incurred, both on account of the taking and overflowing of lands in the prosecution of the Fox River improvements, when the same should be "ascertained in the mode provided by the laws of the state."   The Wisconsin statute expressly provided for compensation for lands "overflowed or otherwise injured or taken."   There was, therefore, no doubt about the liability of the United States for any judgment which might be pronounced by a Wisconsin court, acting under the Wisconsin statute.   The act of congress under which this action was begun may be said to adopt

the law of Kentucky, so far as applicable to a condemnation proceeding of this kind. But the law of Kentucky does not prescribe any rule of damages applicable to a condemnation for any other than railway construction purposes. We are, therefore, to determine under the principles of the common law what is "just compensation," within the meaning of the fifth amendment of the constitution of the United States, for the land here sought to be condemned.

We have already seen that, under the well-settled common law applicable to such cases, damages not directly consequent upon the "taking," but incident to or consequent upon the construction and operation of a public improvement in a prudent and skillful manner, are damnum absque injuria, unless such injuries are to be compensated by the terms of the statute under which the work was prosecuted. But the insistence of the plaintiff in error is that, if the increased cost of insurance or the diversion of the current of the stream from one side of the stream to the other be consequential, the injury from overflow will be a "taking," within the meaning of the constitution. For this the case of Pumpelly v. Green Bay Co., 13 Wall. 181, has been much relied upon. That case does undoubtedly hold that a permanent flooding of private property may be regarded as a "taking." But that case was subsequently characterized as "the extremest qualification of the doctrine," as to nonliability for consequential injuries resulting from a public improvement and without negligence. Transportation Co. v. Chicago, 99 U. S. 642. The opinion just cited likewise calls attention to the fact that there was in that case an actual "physical invasion" of private property amounting to a "practical ouster." In this case there has been no present appropriation or physical invasion of any part of the remainder of the lands of plaintiff in error. There may never be such a permanent flooding as, under the Pumpelly Case, will amount to a "taking." If, as apprehended, the level of the river shall be raised, so as to flood the remaining lands of plaintiff in error, but not of such a permanent character as to amount to a permanent flooding and a practical ouster of the owner, then, under the general rule, the owner, as a riparian proprietor affected by such extraordinary or temporary flooding, will have sustained only such consequential damages as any and all other riparian proprietors will sustain as a consequence of the improvement of the river in the public interest. On the other hand, if the construction of the dam shall result in such permanent flooding as to amount to a "taking," the right of action for the value of the land then taken will for the first time arise, and could not be regarded as barred by the present proceeding.

What we hold is: First, that a mere temporary flooding, not amounting to a "taking," and not the result of negligent construction or maintenance, is an injury consequential upon the proper and lawful improvement of a navigable river, and is not such an injury as would be actionable. That such injuries are apprehended in respect of lands of plaintiff in error not condemned gives no greater right to recover than if the purpose was to construct the proposed dam on the land of a third person. Second. To now seek

compensation for the remainder of the land on the theory that the dam will be so constructed and maintained as to permanently flood the remainder, and amount to a "taking" of such land, is premature. The remainder has not yet been "taken," and until it has been appropriated in fact, by permanent flooding, no right to be compensated will accrue. Third. Neither the anticipated change in the current of the river, nor the anticipated increase in danger from fire during the work of construction, are proper subjects for compensation. Both are injuries purely consequential, and constitute no actionable claim against the government.

The case of Van Schoick v. Canal Co., 20 N. J. Law, 249, was a case where a statute controlled the condemnation, and gave the right only upon compensating the owner for all damages sustained. The case turned upon the meaning of the language of the statute requiring an assessment of all "damages sustained by the owner." The court construed the phrase as contemplating a recovery by the owner of "all damages accruing to the owner of lands from any and every physical effect produced by the construction and use of the canal, * * * whether they arise from the alteration or destruction of a public or private way, the exclusion or the overflowing of waters, the alteration or change in the current of streams or in the destruction of crops, the deterioration of adjacent lands by leakage, or whatever other damages may result from the natural and physical effects produced by the canal." The cases cited from the Kentucky courts, including Asher v. Railroad Co., 87 Ky. 391, 8 S. W. 854, likewise turn upon the construction of the statutes prescribing the damages recoverable. Where there is a statute requiring compensation in condemnation cases for consequential injuries to property not taken, all such damages will presumptively be paid for by the amount awarded in the condemnation proceeding. Pearce, R. R. 203; Railroad Co. v. Thillman, 143 Ill. 135, 32 N. E. 529; Van Schoick v. Canal Co., 20 N. J. Law, 249.

The conclusion we reach is that the judgment must be affirmed.