McMORRAN MILLING CO. *v.* C. H. LITTLE CO.

1. Riparian Rights—Navigable Streams.

   The title of a riparian owner on the St. Clair river extends to the thread of the stream, subject to the paramount right of the United States to use the land in aid of navigation.

2. Navigable Streams—Right of Individual.

   The term "easement of navigation" properly describes the right of an individual member of the public to the navigable streams.

3. Same—Riparian Rights—Commerce—Improvements by United States.

   Under section 8, art. 1, of the Constitution of the United States, the Federal government has the paramount, dominant right, superior to that of the riparian owner, and in the enforcement of that right it may take, control, and regulate, in the interest of navigation, the navigable waters of the nation, and the submerged lands over which they flow.

4. Riparian Rights—Eviction—Contracts—Liability.

   Where defendant, while under contract with plaintiff to pay a stipulated amount quarterly for the privilege of taking sand and gravel from plaintiff's submerged land in the St. Clair river, was stopped in said work by order of the Federal authorities, it was evicted by a right paramount to that of plaintiff, and from that time liability for the quarterly payments ceased.

5. Same—Estoppel.

   That defendant paid the quarterly payments pending the negotiations with the Federal authorities does not furnish any ground for the application of the doctrine of estoppel; plaintiff being in no way harmed by the payments, nor was its position changed by reason thereof.

6. Same—Navigable Streams—Sand and Gravel—Private Parties.

   As between private parties, in Michigan, the sand and gravel in a navigable stream belongs to the riparian owner, and

See note in 34 L. R. A. (N. S.) 1084.

he is entitled to be compensated for it by the private individual who takes it.

7. SAME—STATE'S RIGHTS.

Where the State holds such title it may recover for sand and gravel taken.

8. RIPARIAN RIGHTS—EVICTION—BREACH OF CONTRACT—LIABILITY —DIRECTED VERDICT.

The court below was in error in directing a verdict for plaintiff, it being entitled to recover the contract price only up to the date of eviction, which date was in dispute and was a question for the jury.

Error to Wayne; Collingwood, J., presiding. Submitted January 22, 1918. (Docket No. 17.) Decided June 3, 1918.

Assumpsit by the McMorran Milling Company against the C. H. Little Company for breach of a contract to purchase gravel. Judgment for plaintiff on a directed verdict. Defendant brings error. Reversed.

*Stevenson, Carpenter, Butzel & Backus* (*Thomas G. Long,* of counsel), for appellant.

*Miller, Smith, Canfield, Paddock & Perry,* for appellee.

This record discloses that prior to the year 1909 individuals and companies located at Detroit dealing in building sand and gravel, had, without protest from either the riparian owners or the Federal government, obtained a considerable of their supply from the St. Clair river. Plaintiff is a riparian owner on St. Clair river, defendant a dealer in such sand and gravel. Defendant had been taking sand and gravel from the subaqueous lands appurtenant to plaintiff's property, and plaintiff claimed compensation. Negotiations were had resulting in the execution of the following contract:

"This agreement and indenture made in duplicate and entered into this 30th day of November, A. D. 1909, by and between the McMorran Milling Company, of Port Huron, Michigan, a body corporate organized and existing under the laws of Michigan, party of the first part, and

"The C. H. Little Company, of Detroit, Michigan, a body corporate organized and existing under the laws of Michigan, party of the second part, witnesseth

"Whereas, the said party of the first part is the owner of certain premises in the city of Port Huron, Michigan, known as lot 'A' and easterly portion of lots thirty-nine and forty (39 and 40) also the north one-half of lot 'B' according to Harrington's plat of the city of Port Huron, extending southerly from the Black river, so-called, along St. Clair river to the center line of Court street slip so-called, together with the accumulations and accretions of sand, gravel and other deposits upon the bed of St. Clair river and the Black river in front of said premises and along the side thereof respectively from the shore lines of said rivers to the threads of the streams of the said rivers;

"And, whereas, the C. H. Little Company, the said party of the second part, being desirous of securing and obtaining from the said party of the first part the sole privilege and exclusive right to take, and have the sand, gravel and other deposits, and the whole thereof, or any or either of the same, upon and within the beds of the said St. Clair river, and the Black river within the limits above mentioned, and specified, for the full period of ten (10) years from and after the date hereof, has submitted an offer and proposition therefor to the proper officers and representatives of the said first party, which said offer and proposition has been duly accepted and in corroboration of which this agreement is executed for the sole right, license and privilege of having and taking such sand, gravel and other deposits or any or either thereof therefrom for the said period of ten years.

"Now, therefore, the McMorran Milling Company of Port Huron, Michigan, a body corporate as aforesaid, by its proper officers and representatives, party of the first part, for and in consideration of the payment of the sum of fourteen hundred ($1,400.00) dol-

lars per annum, payable in the sum of three hundred and fifty ($350.00) dollars on the execution and delivery hereof and a like sum of three hundred and fifty ($350.00) dollars in advance on the beginning of each three months' period hereafter, during the said ten years, hereby grants, conveys, lets and licenses unto the C. H. Little Company, a body corporate, as aforesaid, and to its successors and assigns, party of the second part, for the full period of ten years from and after the date hereof, the sole privilege and exclusive right to pump, excavate, dig or otherwise unearth and carry away and have for its own, all the sand, gravel and other deposits, or any or either thereof, and the accumulations and accretions thereof, in front of and along the premises above described, and the said first party hereby waives all claims and demands against the said second party for any such sand, gravel or other deposits which may have been taken by the said second party, or its agents from said premises prior to the date hereof:

"Provided, however, that no excavations shall be made by said second party in any such manner or as to impair or damage the docks, if any, upon the said premises.

"For the consideration specified the party of the second part shall have the right during the term of this lease to use the docks as now constituted or as may be hereafter constructed along the river front of said described property for the purpose of making fast its boats and vessels and laying them alongside a reasonable time.

"And the C. H. Little Company, in consideration of the letting or the licensing of the privileges above mentioned hereby agrees to pay to the said McMorran Milling Company the sum of fourteen hundred ($1,-400.00) dollars per annum, payable three hundred and fifty ($350.00) dollars on the execution and delivery hereof, and a like sum in advance on the beginning of each three months' period hereafter, during the full period of ten years from and after the date hereof.

"This agreement shall be binding upon the successors and assigns of the respective parties hereto.

"In witness whereof, the parties hereto have caused these presents to be duly executed by their proper and

respective officers thereunto duly authorized, as of the day and year first above written.

"McMorran Milling Company,   [L. S.]
   "By H. McMorran, Pres.
"The C. H. Little Company,   [L. S.]
   "By C. N. Ray, General Manager."

In the spring of 1910 defendant was informed by the war department that dredging for sand and gravel on the premises in question would not be permitted, as it worked an interference with navigation. Negotiations were then taken up by both plaintiff and defendant with the war department with a view of permitting the dredging to be done. These negotiations continued for some time but both plaintiff and defendant were unable to persuade the Federal authorities that there should be a change in their attitude and on August 7, 1912, the Government engineer in charge, in the course of a report, brought the consideration of the question to a finality with the following recommendation:

"It is recommended that the C. H. Little Company be told again in no uncertain terms that no dredging for sand and gravel will be permitted in the St. Clair river above the International tunnel between Port Huron and Sarnia."

Pending these negotiations, defendant made its quarterly payments to plaintiff but thereafter declined so to do and this suit was instituted upon the contract resulting in a directed verdict for plaintiff for the amount claimed. Defendant brings the case here and by proper assignments of error submits to this court the two questions of whether the court properly directed a verdict for plaintiff and whether he should have directed a verdict for defendant.

Fellows, J. (*after stating the facts*). Plaintiff is the riparian owner of lands on the St. Clair river. As

201—Mich.—20.

such owner its title extends to the thread of the stream. *Webber* v. *Boom Co.*, 62 Mich. 626; *Lorman* v. *Benson*, 8 Mich. 18; *Butler* v. *Railroad Co.*, 85 Mich. 246; *Fletcher* v. *Boom Co.*, 51 Mich. 277. The character of such title to the subaqueous lands is the important question in this case; and it becomes necessary to determine such character, both as against the sovereign, when the question of navigation is involved, and against private parties when the governmental interests are not at stake.

By section 8, art. 1, of the Constitution of the United States, there was delegated to congress the power:

"3. To regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

In the case of *Gibbons* v. *Ogden*, 9 Wheat. (U. S.) 1, the court had before it acts of the legislature of the State of New York, enacted for the purpose of securing to Robert R. Livingston and Robert Fulton the exclusive rights of navigation in the navigable waters of that State, with boats propelled by fire or steam. In that case Chief Justice Marshall, speaking for the court and construing this section, laid broad and deep the foundation for Federal control over navigation and the navigable waters of the Nation. He said:

"Commerce, undoubtedly, is traffic, but it is something more—it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. * * *
"The power of congress, then, comprehends navigation, within the limits of every State in the Union; so far as that navigation may be, in any manner, connected with 'commerce with foreign nations, or among the several States, or with the Indian tribes.' It may, of consequence, pass the jurisdictional line of New York, and act upon the very waters to which the prohibition now under consideration applies."

In *Gilman* v. *Philadelphia*, 3 Wall. (U. S.) 713, 724, the court said:

"Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the Nation, and subject to all the requisite legislation by congress."

In *South Carolina* v. *Georgia,* 93 U. S. 4, it was held that the right to regulate commerce includes the right to regulate navigation, and hence to regulate and improve navigable rivers and ports on such rivers, and that congress had the power to close up one of several channels in a navigable stream if in its judgment navigation would thus be improved. A somewhat similar question arose in *Commissioners of Homochitto River* v. *Withers,* 29 Miss. 21. In this case Withers owned a valuable plantation alleged to be worth $200,000. By an improvement contemplated by the commissioners in aid of navigation the flow of the stream was diverted from plaintiff's plantation, depriving him of its benefit for agricultural and transportation purposes. His rights were those of a riparian owner, but were held to be subordinate to the rights and power of the State acting in the promotion of navigation and his bill for injunction was dismissed.

The dominant power of congress over the waterways of the country is aptly illustrated by the case of *State of Pennsylvania* v. *Bridge Co.,* which appeared in court on four occasions (9 How. 647; 11 How. 528; 13 How. 518, and 18 How. 421). Without detailing at length the various steps taken in it, it will suffice to say that the court found as a fact that the bridge in question was an obstruction to navigation. Subsequently congress by an act declared it to be a lawful structure, not an obstruction to navigation. Its last appearance in court—18 How. 421—where it was sought to put the decree of the court into force, brought to the attention

of the court the action of congress. The court declined to put its decree into force, recognized that congress had acted within the field committed to its care, and held that while the bridge was, as matter of fact, an obstruction to navigation, after the passage of the act it was not so in the contemplation of law, and the hand of the judiciary was stayed because of the power delegated to congress under the commerce clause of the Constitution above quoted.

In *United States* v. *Irrigation Co.*, 174 U. S. 690, the court had under consideration the prior appropriation of waters of a nonnavigable stream; such waters ultimately going to keep up the navigability of a navigable stream. The right of the State to change the common law rule as to streams within its dominion was recognized; but that right was subject to two limitations, the second being:

"*Second,* that it is limited by the superior power of the general Government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. In other words, the jurisdiction of the general Government over interstate commerce and its natural highways vests in that Government the right to take all needed measures to preserve the navigability of the navigable water courses of the country even against any State action."

The Federal cases to which we have referred had to deal generally with the power of congress under the commerce clause of the Constitution to regulate navigation, navigable waters and obstructions to them. They did not have to deal directly with the question we have here under consideration, viz: The dominion of the Federal Government acting through congress over the subaqueous lands of navigable streams. They were, however, but the forerunners of the cases having to deal directly with that subject. One of the early Federal cases having that question under consideration is *Hawkins Point Light-House Case*, 39 Fed. 77.

The action was ejectment. Plaintiff claimed title to the submerged soil of the Patapsco river by grant from the State of Maryland; defendant was the keeper of the light-house and was defended by the Government, the basis of defense being that the right of the United States to the subaqueous land and its use to erect a light-house upon in aid of navigation was paramount to the right of plaintiff under his grant. The defense was sustained. A very able brief by the district attorney will be found in the report of the case.

In *Scranton* v. *Wheeler*, 113 Mich. 565, this court had before it the character of the title to submerged lands in the St. Mary's river, as between the riparian owner and the Federal Government. Plaintiff was a riparian owner and as such took title to the thread of the stream. Defendant was then superintendent of the St. Mary's Falls canal and was defended by the Government. The Government had taken possession of the submerged lands and built a pier. The case had before that been removed to and heard in the Federal court, and the opinion there was written by Judge Lurton. It is reported in 57 Fed. 803. Judge Lurton denied the plaintiff's right of recovery and sustained the paramount right of the Federal Government, saying:

"But while the plaintiff, under the law of Michigan, is seised of the legal title to the soil under the water, yet, in the very nature of the property, such seisure is of the bare technical title."

The case was taken to the United States Supreme Court, but that court declined to consider it on jurisdictional grounds and it went back to the Chippewa circuit for trial and came to this court upon writ of error to that court. This court, speaking through Mr. Justice Grant, there said:

"It is conceded that under the law of Michigan the title to submerged land is in the adjoining owner to

the thread of the stream. It is insisted in behalf of the plaintiff that the Government possesses no right to so use his land, although submerged, and although necessary to so use it in aid of navigation, as to cut off his access to the open water. It is contended on the other hand that this title to submerged lands along navigable waters, and the right of access thereto, are subject to the paramount right of the United States to use this land in such manner as it shall determine to be necessary in aid of navigation. The court of appeals was unanimous in its opinion against the plaintiff's claim. In a very able opinion delivered by Judge Lurton the facts are clearly stated, the authorities cited, and we think the conclusion there reached is the correct one."

The case was reviewed in the Supreme Court of the United States (179 U. S. 141), and the judgment of this court affirmed. It was there said by Mr. Justice Harlan, speaking for the court:

"So that whether the title to the submerged lands of navigable waters is in the State or in the riparian owners, it was acquired subject to the rights which the public have in the navigation of such waters. The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation."

But it remained for the case of *United States* v. *Power Co.*, 229 U. S. 53, to finally put at rest the rights of riparian owners on navigable streams as against

the sovereign.   This case arose in this State and was condemnation proceedings instituted by the United States Government against the Chandler-Dunbar Water Power Co. and others in the district court for the western district.   The company was the owner of lands bordering on the St. Mary's river.   Appurtenant to such lands was a valuable water power, which had been but partially developed by the defendant.   Congress, by section 11, of the act of March 3, 1909 (35 U. S. Stat. pp. 815, 820, chap. 264), had declared that all the lands between the ship canal and the International boundary line were necessary for the purposes of navigation.   The company insisting upon its rights as riparian owner to the subaqueous lands and the flow of the stream, insisted upon compensation in the sum of $3,450,000 for the taking of such rights which it claimed were its private property and could not be taken without just compensation.   The government insisted upon its paramount title, upon its right as sovereign to take without compensation all the subaqueous lands, together with the flow of the stream for purposes of navigation.   It conceded its obligation to pay for fast lands taken, but denied its liability for taking the submerged lands and the flow of the stream appurtenant thereto, and insisted that congress was the sole judge of the necessity and that such necessity was not for judicial inquiry.   The trial court awarded $550,000 for the undeveloped  water power taken and both parties appealed.   The award was set aside and the court set at rest for all time the claim of riparian owners that as against the Government's needs of navigation their rights in the navigable waters of the nation and the submerged lands over which they flow were not subservient.   Mr. Justice Lurton, speaking for the court, said:

"This title of the owner of fast land upon the shore of a navigable river to the bed of the river, is at best

a qualified one. It is a title which inheres in the ownership of the shore and, unless reserved or excluded by implication, passed with it as a shadow follows a substance, although capable of distinct ownership. It is subordinate to the public right of navigation, and however helpful in protecting the owner against the acts of third parties, is of no avail against the exercise of the great and absolute power of congress over the improvement of navigable rivers. That power of use and control comes from the power to regulate commerce between the States and with foreign nations. It includes navigation and subjects every navigable river to the control of congress. All means having some positive relation to the end in view which are not forbidden by some other provision of the Constitution, are admissible. If, in the judgment of congress, the use of the bottom of the river is proper for the purpose of placing therein structures in aid of navigation, it is not thereby taking private property for a public use, for the owner's title was in its very nature subject to that use in the interest of public navigation. If its judgment be that structures placed in the river and upon such submerged land, are an obstruction or hindrance to the proper use of the river for purposes of navigation, it may require their removal and forbid the use of the bed of the river by the owner in any way which in its judgment is injurious to the dominant right of navigation."

The case was followed in *Lewis Blue Point Oyster Co. v. Briggs*, 229 U. S. 82. In this case the plaintiff held title to shallow submerged lands in Great South Bay in the State of New York. The foundation of its title was a royal grant when New York was a dependency of Great Britain. The Government in aid of navigation arranged to cut a channel across this shallow land, thus destroying plaintiff's oyster beds. The State court sustained such right of the Government, and this judgment was affirmed. The opinion of the State court is an able one and worthy of careful consideration—198 N. Y. 287.

The following cases will be found to be of interest

on this subject: *Gibson* v. *United States,* 166 U. S. 269; *Wisconsin* v. *Duluth,* 96 U. S. 379; *United States* v. *Mining Co.,* 81 Fed. 243 (on appeal see 88 Fed. 664); *Warner* v. *Manufacturing Co.,* 123 Ky. 103; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Chicago, etc., R. Co.* v. *Drainage Com'rs,* 200 U. S. 561; *Commonwealth* v. *Alger,* 7 Cush. (Mass.) 53; *Green Bay, etc., Canal Co.* v. *Paper Co.,* 172 U. S. 58; *Shively* v. *Bowlby,* 152 U. S. 1; *Sage* v. *Mayor, etc., of New York,* 154 N. Y. 61; *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387; *Lorman* v. *Benson, supra; Rice* v. *Ruddiman,* 10 Mich. 125.

It is true that originally the title to the submerged lands of the navigable waters of the country was in the United States, but it is also true that such title was burdened with a trust for the use and benefit of the people for commerce and navigation. It is true that upon the admission of a State to the union of States, it took such title, but it took it burdened with such trust. It is true that the State might either by legislative enactment or judicial decision as has been done in this State, retain such title to the bed of the Great Lakes and surrender such title to the riparian owner upon streams; but such title in the hands of either the State or riparian owner was still burdened with the trust. It was said by Judge Lurton in *Scranton* v. *Wheeler,* 57 Fed. 803, 813:

"It must, from these constitutional principles, follow that the State of Michigan held the soil beneath her navigable rivers under a high public trust, to forever preserve them free as public highways, subject only to the power of congress to regulate commerce among the States. The legal title which, under the law, becomes vested in such proprietors, must be subject to the same public trusts, and therefore subordinate to the rights of navigation, and subordinate to the power of congress to control and use the soil under such streams whenever the necessities of navigation and commerce should demand it. The right of con-

gress to regulate commerce, and, as an incident, navigation, remains unaffected by the question as to whether the title to the soil submerged is in the State, or is in the owner of the shores. A distinction must be recognized between that which is *jus privitum*, and that which is *jus publicum*. This private right is subordinate to the public right. The plaintiff holds the naked legal title, and with it he takes such proprietary rights as are consistent with the public right of navigation, and the control of congress over that right."

See, also, *State* v. *Land Co.*, 160 Mich. 680; *Illinois Steel Co.* v. *Bilot*, 109 Wis. 418; *State* v. *Gerbing*, 56 Fla. 603; *Stockton* v. *Railroad Co.*, 32 Fed. 9. In the last cited case it is said:

"It is significantly asked, Can the United States take the State-house at Trenton, and the surrounding grounds belonging to the State, and appropriate them to the purposes of a railroad depot, or to any other use of the general Government, without compensation? We do not apprehend that the decision of the present case involves or requires a serious answer to this question. The cases are clearly not parallel. The character of the title or ownership by which the State holds the State-house is quite different from that by which it holds the land under the navigable waters in and around its territory."

It will be noted in cases involving this question that the expression "easement of navigation" is frequently used. This term should not be confused. When applied to the unorganized public, the individual member of the public, it unquestionably correctly describes his right. He has the right of passage, an easement. But when considering the organized public as represented by the government it does not measure or correctly describe its rights. The Government has something more than an easement, a right of passage. It has the paramount, dominant right, superior to that of the riparian owner, and in the enforcement of that right it may take, control, and regulate, in the interest

of navigation, the navigable waters of the Nation and the submerged lands over which they flow. This record discloses the necessity of regulating the flow of the connecting waters of the Great Lake system in order to maintain the water levels of the lakes. We will take judicial notice, because the various acts of congress have made the necessary appropriations, of the millions of dollars that have been expended in the improvements of harbors and channels of the Great Lakes and the enormous expenditures upon the locks at Sault Ste. Marie. To obtain the full benefit of these improvements the levels of the lakes must be maintained. The premises in question are at the outlet of Lake Huron. It is self-evident that indiscriminate dredging of this outlet would affect navigation, would affect the levels of the lakes. When the Federal authorities proceeding under an act of congress, Act March 3, 1899, chap. 425, § 10 (30 U. S. Stat. p. 1151), undertook to stop this indiscriminate dredging they were but asserting this paramount right of the Government, they were but protecting that which in the language of the Supreme Court of the United States in *Gilman* v. *Philadelphia, supra,* is "the public property of the Nation."

When defendant stopped in the work of taking sand and gravel from plaintiff's submerged lands pursuant to the orders made by the Federal authorities he was evicted by a paramount right to that of the plaintiff, and from then on his liability for the quarterly payments ceased. *Marsh* v. *Butterworth,* 4 Mich. 575; *Stott Realty Co.* v. *Amusement Co.,* 195 Mich. 684; *Harrington* v. *Sheldon,* 196 Mich. 388.

The numerous cases of the character of *Hyatt* v. *Brewing Co.,* 168 Mich. 360, cited by plaintiff, are not in point. The cases have not under consideration the question of eviction. In each of these cases the defense was made that the enactment of prohibition

legislation, either local or State wide, terminated the lease, and in each of the cases such defense was overruled. But they are not analogous in any way to those cases where the tenant has been evicted by one holding a paramount right. The business they are conducting is put an end to under the police power of the State, their occupation is gone, but, as said by Mr. Justice BROOKE in the *Hyatt Case,* "The premises demised could have been used for other than the specified purpose." Not so here. The premises in the instant case had but one use, that of obtaining sand and gravel. The Federal Government in the exercise of its dominant right had put an end to the only use for which the premises were adapted. This was an eviction.

The real consideration, the moving consideration, for the payment of $14,000 in quarterly payments covering a period of 10 years, was the "exclusive right to pump, excavate, dig or otherwise unearth and carry away and have for its own, all the sand, gravel and other deposits." The right of dockage was an incident to this right and in the furtherance of its enjoyment. There were no deposits of any value in Black river as the testimony shows. This exclusive right has failed by the establishment of a paramount right and an eviction thereunder. Hence the consideration has failed.

But it is urged by plaintiff's counsel that the settlement for sand and gravel taken before the contract was entered into furnished the consideration. In this regard the case is not unlike that of *Louisville, etc., R. Co.* v. *Mottley,* 219 U. S. 467. In that case Mottley and wife were seriously injured in a collision on the road of the plaintiff in error and in 1871 settled their claim for damages by an agreement with the railroad company to accept free passes for the balance of their lives respectively. The contract was kept until con-

gress, acting under the commerce clause above quoted, and considered in this case, prohibited common carriers from issuing free passes. When the company declined to further carry out the contract suit was brought to enforce it. The legislation was upheld as within the power of congress and the enforcement of the contract was denied. We might say in the instant case, as was there said:

"Whether, without enforcing the contract in suit, the defendants in error may, by some form of proceeding against the railroad company, recover or restore the rights they had when the railroad collision occurred is a question not before us, and we express no opinion on it."

Nor does the fact that defendant paid the quarterly payments pending the negotiations with the Federal authorities furnish any grounds for the application of the doctrine of estoppel. Plaintiff was in no way harmed by the making of these payments to it, nor did it in any way change its position by reason thereof. The learned trial judge was in error in directing a verdict for the plaintiff.

We have already stated that when defendant ceased its operations of procuring sand and gravel from plaintiff's subaqueous lands pursuant to the orders of the Federal authorities, it was evicted by a paramount right and was no longer obligated to make the quarterly payments set forth in the agreement. The testimony of the parties is not in accord as to when this time was. Plaintiff's testimony tended to fix a later date than that fixed by defendant's proof. It is unquestionably the law that as between private parties the sand and gravel in a navigable stream belongs to the riparian owner in those States, where, as in ours, the riparian owner owns to the thread of the stream, and he is entitled to be compensated for it by the private individual who takes it. *Archer* v. *Gravel Co.,*

233 U. S. 60. Where the State holds such title it may recover for sand and gravel taken. *Wear* v. *Kansas,* 245 U. S. 154 (38 Sup. Ct. 55). In the instant case the plaintiff would be entitled to recover the contract price up to the date of eviction. What that date was is in dispute and was a question for the jury. The trial court did not err in refusing to direct a verdict for the defendant.

The judgment is reversed and a new trial granted. Defendant will recover costs of this court.

BIRD, MOORE, BROOKE, STONE, and KUHN, JJ., concurred with FELLOWS, J. OSTRANDER, C. J., and STEERE, J., concurred in the result.